STEWART T. TANNER, Respondent, v. A. C. NELSON, State Superintendent of Public Instruction of the State of Utah, Appellant.

No. 1417.    (70 Pac. 984.)

1.  **Schools and School Districts: School books: Change Convention: Acts: Nature: Injunction Proper Remedy.**
    Revised Statutes, sections 1854, 1855, 1859, require the state superintendent, county superintendent, and principal of the state normal school, or a majority of them, to decide what text-books shall be used in the district schools, and provide for the calling of a convention, at which sealed proposals for furnishing such books shall be received, at which the convention shall adopt such text-books for the period of five years, and requires that a contract shall be let to the successful bidder for the furnishing of such books. *Held*, that the acts required of such convention were not judicial, and hence a person injured by its determination was entitled to restrain the execution thereof.

2.  **Same: Statutes: Directory.**
    The provision of Revised Statutes, section 1856, that the convention called by the state superintendent of instruction to receive bids for the furnishing of schoolbooks, and for the letting of a contract therefor, "shall meet and publicly open and read the proposals," is directory only, and failure to literally comply therewith is immaterial.

3.  **Same: Substantial Compliance.**
    Where bids for furnishing schoolbooks, submitted to a convention called by the state superintendent of instruction, as required

by Revised Statutes, section 1855, were voluminous, and contained large catalogues, price lists, etc., and on the first day of the session the bids were publicly opened, and the introductory portions of each bid, and the communications accompanying them, were read, when the proposals were referred to committees on tabulations, and were open to inspection of all persons interested therein, there was a substantial compliance with section 1856, requiring the convention to meet and publicly open and read the proposals.

**4. Equity: Right to Relief: Infinitesimal Damage.**

Where the immediate outlay of a parent because of a change in books amounted to $3.55, and this amount would be considerably reduced by a reduction in the price of books his children would subsequently require, on being promoted to higher grades, his loss was too small to justify a court of equity in enjoining the change, which appeared to be beneficial.

**5. Contractors' Bonds: Amount Determined.**

Where a convention for the adoption of text-books fixed the bond to be executed by the contractor for readers, and declared that the amount of such bond was to be used as a basis of fixing all other bonds, an objection that the convention failed to fix the amount of such other bonds was not sustainable; the amount of such bonds being determinable by mere mathematical calculation.

(Decided December 18, 1902.)

Appeal from the Third District Court, Salt Lake County.— *Hon. W. C. Hall,* Judge.

Bill in equity to restrain the defendant from entering into contracts with certain publishing houses for the future use of certain text-books in the district schools of the State of Utah. From a decree perpetually enjoining the defendant, he appealed.

REVERSED.

*Hon. M. A. Breeden,* Attorney-General, and *Messrs. Brown & Henderson* for appellant.

Tanner v. Nelson.

The appellant first contends that the executive of the State can never be interfered with by the court of chancery. Bancroft v. Thayer, 5 Sawyer 502; Western Ry. Co. v. De-Graff, 27 Minn. 3; State of Mississippi v. Johnson, 4 Wall. 501; Dickey et al. v. Reed et al., 78 Ill. 270; Harris et al. v. Schryock et al., 82 Ill. 120; Gains v. Thompson, 7 Wall. 348; Lane v. Morrill, 51 N. H. 422; People v. Board of Supervisors, 75 Cal. 179; Coco v. Gumbel; 17 Southern Rep. 421; State v. Lord, 43 Pac. Rep. 473; Beach, sec. 668-678; Oregon v. Taylor, 25 L. R. A. 862; People of the State of New York v. Canal Board, 55 N. Y. 394; Secomb v. Kittleson, 29 Minn. 555-561.

*Messrs. Richards & Varian* and *Messrs. Whittemore, Bierer & Cherrington* for respondent.

The convention, being an inferior body, possessed only such powers as were given to it by the statute. The law prescribes the course to be pursued and the things to be done, in order to effect a change in the text-books of the public schools, and the convention must follow its mandates. Green v. Board of Education, 63 Pac. 161.

Provisions relating to meetings of officers authorized to select schoolbooks are mandatory and must be observed. Glynn v. School Dist., 5 Lack. Leg. N. 313; note to Campana v. Calderhead, 35 L. R. A. 277.

*Messrs. Bennett, Sutherland, Van Cott & Allison* and *A. L. Hoppaugh, Esq.*, amici curiae.

### STATEMENT OF FACTS.

It appears from the record in this case that appellant, A. C. Nelson, state superintendent of public instruction, gave notice, as required by section 1855 of the Revised Statutes, that the superintendent of public instruction, the principal of the state normal school, and the county superintendents

of the district schools for the several counties of the State, would hold a convention at Salt Lake City on Saturday, May 31, 1902, at 2 o'clock p. m., for the purpose of adopting text-books for use in the district schools of this State, except in cities of the first and second class, for a period of five years. The notice, in all respects, complied with the requirements of section 1855. After the publication of the notice, the superintendent of public instruction received from thirty-eight different publishing companies proposals to furnish schoolbooks for the ensuing five years. The bids, with two exceptions, contained from one-half page to six pages of closely typewritten matter, each bid containing four columns of figures, giving the different prices, viz., one column giving the introductory, one the wholesale, one the retail, and one the exchange price. Some of the publishing houses submitted their trade catalogues of books, containing from six to two hundred and forty-six pages of printed matter, and made them a part of their bid; and in some cases the sample copies of the books furnished by them were also made a part of the bids. The convention, consisting of twenty-nine members, met pursuant to the notice given, and, at the time and place therein specified, was duly organized. The proposals made by the different publishing houses were publicly opened, and the introductory part of each bid read to the convention by the secretary thereof. Some of the proposals were read in full, but, as to a majority of them, those portions containing the names of the books and the prices were not read at the time the bids were opened. The following is a sample of the introductory parts of the bids, and some of the communications accompanying them, that were read by the convention:

"To the State Book Convention, Salt Lake City—Gentlemen: In compliance with your advertisement of March 25, 1902, we, the undersigned publishers, submit the following proposal to furnish the public schools of the State of Utah, for the period required by law, any or all of the following publications, at prices indicated in the columns below.

Tanner v. Nelson.

Bids accompanied by samples to be opened May 31, 1902. Respectfully submitted, Hinds & Noble, per Arthur Hinds, of the Firm."

"State Book Convention, Salt Lake City, Utah—Dear Sir: Inclosed we hand you, according to request, blank duly filled out for seventeen of our publications, constituting our bid, which we respectfully submit in compliance with your advertisement of March 25, 1902, requesting publishers to submit proposals to furnish the public schools of the State of Utah with text-books for the period required by law. The first book named is Gordy's Psychology, which we submit at the particular request of the board of education of Salt Lake City. A sample of Gordy's Psychology and other books named in the bid have been forwarded to you by Wells, Fargo Express, prepaid. In the note upon the blank, you invite us to offer, in the form of a separate communication, any additional information or data. So we desire to say, regarding 'exchange price,' that we attach our regular yellow catalogue, in which we quote the prices we pay for text-books of all kinds. So that if you should wish to pay for Gordy's New Psychology, for example, with any of your discarded books, other than psychology, you could do so by sending us any whatever priced in said yellow catalogue. In other words, we are always willing to accept in exchange reasonable quantities of any of the one thousand or more different schoolbooks mentioned in this yellow catalogue at the prices and on the conditions stated therein. Cordially yours, Hinds & Noble."

Five committees, of three members each, on tabulation were appointed, and all proposals were referred to such committees, and by them tabulated; that is, all books on each particular subject or course of study were brought together under one head, giving the names of the companies publishing them, and the different prices at which they were offered; thereby enabling the members to see at a glance and compare the bids and prices for which any particular class

or kind of books were offered. Each member of the convention was furnished with copies of these different tabulated statements. In preparing these statements the committee on tabluation were compelled to examine and read all those parts of the proposals containing the prices at which the books were offered, so as to rewrite and arrange them as above stated. The tabulations were publicly made. The doors of the committee room were open, and book agents, representatives of the publishing houses, and visitors came and left at will, while the work was going on. When the question of determining what books to adopt came up for consideration, the bids, as they appeared on the tabulated statements, were considered in the order in which they had been reported by a committee on order of business. During the discussion, which at times was animated and earnest, each bid was at some time read by members of the convention, either from the rostrum, or during the public discussion. It also appears from the record that the original bids were placed in a pile, and retained in the convention for reference, and were open to public inspection. On the first day of the session, when the bids were opened, and the introductory parts thereof read, all persons, including book agents and representatives of the publishing companies, were permitted to be in attendance without restriction. On the second day a resolution was adopted excluding all persons other than members, except by invitation. This rule was never enforced, but, on the contrary, as affirmatively shown by the record, the proceedings were open to all persons who wished to attend, except book agents, who were excluded. The resolution of exclusion was revoked and set aside before the committees on tabulation completed their work and reported, and before the convention considered the question as to what books should be adopted. With very few exceptions, the books adopted by the convention are lower in price—many of them being from ten to forty per cent. cheaper—than those adopted five years ago, and now in use in the public

schools. It is estimated that the school population that will be affected by the change is from 55,000 to 60,000. A committee was appointed to specify the amount of bonds that should be required of the publishing companies whose proposals had been accepted. This committee reported, and recommended that the bonds be fixed in sums ranging from $500 to $7,000; the amount of each bond to be determined by the size of the contract. The amounts recommended by the committee were double the amounts of the bonds furnished by the publishing houses now supplying books for the public schools of this State under similar contracts. On motion, duly adopted, the committee was given power to act conclusively for the convention, and that the bonds be based on the amount required for the subject of readers, which was $7,000 as reported by the committee. Plaintiff has four children of school age, who are supplied with school books heretofore and now in use. The change of books made by the convention, if adopted and used by the public schools, would necessitate an immediate expense and outlay by plaintiff of $3.55 in order to supply his four children with the new books. The probable amount he would be able to save in the next five years in the purchase of books adopted by the convention, as his children are promoted in their studies and advance to higher grades, because of the reduction in price, does not appear. Plaintiff filed his bill in equity to restrain defendant from entering into contracts with the publishing houses whose proposals had been accepted, on the grounds: First, that the convention failed and neglected to publicly open and read the proposals, as required by section 1856, Revised Statutes; and, second, that the convention failed to fix the amount of the bonds, as required by section 1859, Id., to be given by the publishing companies whose proposals were accepted. Defendant answered, and the court made its findings and conclusions, and entered a decree perpetually enjoining the defendant from entering into the contracts mentioned.

McCARTY, District Judge, after stating the foregoing facts, delivered the opinion of the court.

Appellant's first contention is that the convention was a body of public officers of mixed powers, possessing and exercising legislative, executive, and judicial functions; hence it cannot be restrained by injunction, or its acts and proceedings collaterally attacked; and that respondent's remedy, if he has any, is by writ of certiorari. The convention is not a party to the suit, and is not before the court. The action is brought to enjoin a public officer from performing an act, the legality of which depends upon the regularity of the proceedings of the convention. This being so, the only question raised by this contention, necessary for us to determine, is, was the action or proceeding of the convention in any respect judicial? "The distinction between a judicial and legislative act is well defined. The one determines what the law is; and what the rights of parties are with reference to transactions already had. The other prescribes what the law shall be in future cases arising under it. Whenever an act undertakes to determine a question of right or of obligation or of property, as the foundation upon which it proceeds, such act is to that extent a judicial one; and not the proper exercise of legislative functions." Per Field, J., in the Sinking Fund Cases, 99 U. S. 761, 25 L. Ed. 504. In the case of People v. Board of Education of Oakland, 54 Cal. 375, the facts are in some respects identical with those under consideration. The question involved in that case arose over the adoption of certain schoolbooks by the defendant board of education; and the court, following the above rule as laid down by the Supreme Court of the United States, held that the action of the board of education adopting the books was not judicial. Section 1854, Revised Statutes, provides that "the state superintendent, county superintendents, and the principal of the state normal school, or a majority of them, shall decide what text-books shall be adopted in the district schools, except in cities of the first and of the second

class; and their use shall be mandatory in all district schools of the State except in cities of the first and of the second class." Section 1855, Id., provides that: "The state superintendent shall call a convention at least thirty days prior to the expiration of any contract regulating the supply and use of text-books in the district schools throughout the State, and shall give at least sixty days' notice of the time of holding such convention, by publication in a newspaper having general circulation in the State. Said notice shall state the subjects upon which text-books will be adopted, and that sealed proposals will be received by the state superintendent of schools for furnishing such books, the place where and the day and the hour when all proposals will be opened, and that the convention reserves the right to reject any and all proposals. Said convention shall be called for the adoption of text-books every five years from and after the first adoption, as herein provided; and any text-book so adopted shall not be changed within a period of five years after its adoption, except for a sufficient cause to be decided at a special convention called for that purpose." Section 1859, Id., provides that "the publisher or publishers whose proposals shall be accepted must enter into a written contract with the state superintendent of schools, and shall give a bond with two sufficient sureties in a reasonable sum, to be fixed by the convention, for the faithful performance of such contract." The powers and duties of the convention are clearly defined by the foregoing provisions of the statute, viz.: First, to publicly open and read the proposals; second, to decide what books, if any, of those offered, shall be adopted; and, third, to fix the bond to be given by the publishing house furnishing books. There was no party before the convention prosecuting any right. In fact there was no question whatever before it for adjudication in which personal or property rights were involved. Neither of the acts above mentioned is in any sense judicial, as the term is used and understood when applied to courts and judicial bodies. The rule is well settled that when a pub-

lic body exercising legislative functions exceeds its authority, and adopts any ordinance, rule, or regulation in violation of or in conflict with constitutional or statute law, prejudicial to public or individual rights, any person who will sustain personal injury thereby, for which adequate compensation can not be had, may apply to a court of equity, and restrain the officer whose duty it is to enforce such void ordinance, rule, or regulation. 1 Spell. Extr. Relief, sec. 688, and cases cited; Krieschel v. Board (Wash.), 41 Pac. 186; Board v. McComb, 92 U. S. 531, 23 L. Ed. 623; Campana v. Calderhead (Mont.), 44 Pac. 83, 36 L. R. A. 277; Rand, McNally & Co. v. Hartranft (Wash.), 70 Pac. 77.

We now come to the consideration of the vital question in this case, viz., did the convention comply with the requirements of section 1856, Revised Statutes, which provides that the convention shall meet and publicly open and read the proposals? Appellant contends that the provisions of this section are directory, and that its terms were substantially complied with by the convention. Respondent insists that the statute is mandatory, and that the bids should have been read as they were opened, and the failure of the convention to do so was fatal to its proceedings. "The consequential distinction between directory and mandatory statutes is that the violation of the former is attended with no consequences, while a failure to comply with the requirements of the other is productive of serious results . . . The statutory provisions which may thus be departed from with impunity without affecting the validity of the statutory proceedings are usually those which relate to the mode or time of doing that which is essential to effect the aim and purpose of the Legislature, or some incident of the essential act." Again the same author says: "Where the provision is in affirmative words, and there are no negative words, and relates to the time or manner of doing the acts which constitute the chief purpose of the law, or those incidental or subsidiary thereto, by an official person, the provision has been usually treated as di-

rectory. Generally it is so, but it is a question of intention.
Where a statute is affirmative, it does not necessarily imply
that the mode or time mentioned in it are exclusive, and that
the act provided for, if done at a different time or in a
different manner, will not have effect. 'It would not, per-
haps, be easy,' said Sharswood, J., 'to lay down any general
rule as to when the provisions of a statute are merely directory,
and when mandatory and imperative. When the words are
affirmative, and relate to the manner in which power or juris-
diction vested in a public officer or body is to be exercised, and
to the limits of the power or jurisdiction itself, they may be,
and often have been, construed to be directory.' Unless a
fair consideration of a statute directing the mode of proceeding
of public officers shows that the Legislature intended com-
pliance with the provisions in relation thereto to be essential
to the validity of the proceeding, it is to be regarded as di-
rectory merely." Suth. St. Const., secs. 446, 447. Mr.
Sedgwick, in his work on Statutory and Constitutional Law
(368), says: "When the statute directs an act to be done
in a certain way at a certain time, and a direct compliance as
to time and form does not appear to the judicial mind to
be essential, the proceedings are held valid, though the com-
mand by the statute has been disregarded. The statute in
such a case is said to be directory." Black, in his work on
Interpretation of Laws (section 127), says: "Irregularities
in official action, consisting in the neglect or lack of strict
compliance with statutory directions, should not be allowed
to vitiate the proceedings taken under a statute, when the
objects and ends of the statute have been substantially accom-
plished, and neither the public nor private persons are injured
by the course of proceedings." Applying this rule to the
statute under consideration, its provisions can not be con-
strued other than directory, so far as they relate to the time
when the proposals shall be read. To hold that the provisions
of the statute relative to the time when the bids shall be read
is mandatory, and must be strictly and literally construed and

followed, as contended by respondent, viz., "that the bids shall be 'read' at the first session of the convention," would render the statute nugatory. Because of the great length of the proposals, and the voluminous amount of matter they contained, it would have been an utter impossibility for the convention to have read them on that day. It is a common rule of statutory construction that, when language construed in a strict and literal sense would lead to an absurdity, such language should be liberally construed, when by so doing the object and purpose of the statute will be accomplished. Suth. St. Const., sec. 238; Van Fleet v. Van Fleet, 49 Mich. 610, 14 N. W. 566; Smith v. People, 47 N. Y. 330; People v. Davenport, 91 N. Y. 574; Mayor, etc., v. Root, 8 Md. 95, 63 Am. Dec. 696; Swift & Given's Appeal, 111 Pa. 516, 2 Atl. 539; Lau Ow Bew v. U. S., 144 U. S. 47, 12 Sup. Ct. 517, 36 L. Ed. 340.

It is not contended that the proposals were not read at all, but respondent insists that the time and manner of reading them was in no sense a compliance with the law, and that it failed to give the publicity intended by the foregoing provisions of the statute. It is conceded that on the first day of the session the introductory portions of the bids, and the communications that accompanied them, some of which were elaborate in detail, were read to the convention; that, when proposals were referred to the committees on tabulation, they were open to public inspection; that the doors of the committee room were thrown open, and all persons, including the agents and representatives of the publishing companies, were permitted to attend, and had an opportunity to examine all the proposals; and that there was no attempt to conceal anything that was being done. The record shows that the tabulated statements were open to public inspection, and that all of each bid was at some time read to the convention. The proposals, in the aggregate, contained 65 3-4 pages of typewritten matter. Allowing twenty minutes for the reading of each page (estimate made by respondent's witness), it would

take nearly three days, of eight hours each, to read the type-written matter contained in the bids; and to include the printed catalogues that are made a part of the bids would require much additional time. It is evident that neither the members of the convention, the public, nor any person present, would or could have been benefited by the reading of the proposals in full, one after another, as they were opened, as no person could have remembered the innumerable details of the bids, and the hundreds of different prices at which the books were offered. The respondent has not pointed out, and the record fails to disclose, wherein he, the public, or any person, can possibly be injured or in any way prejudiced by the failure of the convention to read the proposals seriatim as they were opened. There is no claim made, nor is it even suggested, that, if the convention had read the bids in the order contended for by respondent, the convention would or could have made a more wise selection of books than those adopted by it. The course pursued by the convention was not only practicable, but a substantial compliance with the requirements of the statute. It is apparent that the intent and purpose of the statute is to prevent any bid from being suppressed or changed after it is received, and insure a fair and impartial consideration of all proposals submitted, and thereby prevent the public from being imposed upon through fraud or collusion. That this was accomplished is not denied. Fraud is not charged or alleged, nor is there anything in the record that even suggests that the convention, or any of its members, failed in any particular to conscientiously perform every duty required of them, or that the books selected by the convention are not the very best that were listed and offered by the publishing houses.

While a change in text-books would necessitate an immediate outlay by respondent of $3.55, it is evident that during the next ensuing five years, as his children advance in their studies, and are promoted to higher grades, necessitating the purchase of new books, the amount he

Tanner v. Nelson.

would save because of the reduction in price would equal, if not greatly exceed, the $3.55 first paid out, which would make his damage, if any, infinitesimal in amount, and trivial in the extreme. The record is silent as to whether the books adopted are better and more modern than those now in use by the public schools, yet it is presumable that such is the case, as some of the leading and most experienced educators in the State were members of the convention, and voted for a change. For a court of equity to grant relief when the injury threatened is more theoretical and imaginary than real and substantial, as it appears to be in this case, and when the probable consequences will be far-reaching, and detrimental to almost the entire public school system of the State, by depriving it of the use of the best, most modern, and up-to-date books, thereby retarding the intellectual growth and development of from 55,000 to 60,000 school children, would be an unauthorized use, if not abuse, of power.

The contention that the convention failed to fix the amount of the bonds to be given by the publishing companies whose proposals had been accepted is untenable, and not supported by the record. The bond to be given on the subject of readers was fixed at $7,000; this amount to be used as a basis for the fixing of all other bonds; the amount of each bond to be determined by the size of the contract for which it is given. With the awards before him, the state superintendent of public instruction, by a simple mathematical calculation, can readily determine the amount of each bond. We are of the opinion, and so hold, that the convention substantially complied with the requirements of the statute relative to fixing the bonds.

The case is reversed, with directions to the trial court to set aside the injunction and dismiss the action; costs to be taxed against respondent.

BASKIN and BARTCH, JJ., concur.