## UNITED STATES v. LIM YUEN et al.

(District Court, E. D. North Carolina.   March 16, 1914.)

Nos. 37–39.

ALIENS (§ 23*)—CHINESE PERSONS—DEPORTATION PROCEEDINGS—MINORS.

Where certain Chinese persons while minors were admitted into the United States, without fraud, as the sons of a Chinese merchant and a Chinese teacher, residents of the United States, they were not subject to deportation because, after arriving at age, they were found working as laborers in a laundry.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 76–90; Dec. Dig. § 23.*]

Deportation proceedings by the United States against Lim Yuen, Lam Gong, and Chan See Jock.   Order directing defendants' discharge.

Francis D. Winston, U. S. Dist. Atty.

Thos. W. Davis, of Wilmington, N. C., and J. H. Ralston, of Washington, D. C., for respondents.

CONNOR, District Judge.   Warrants were taken out by the inspector charging that respondents, Chinese persons, were unlawfully working as laborers in a laundry located at Wilmington, N. C.   Upon the return of the warrants, the respondents appeared in person and by counsel.   The three cases were, by consent of the district attorney and counsel for respondents, heard together.   All questions in regard to the form of the affidavits and of the warrants were waived.   The examination of the witnesses produced by the government and the respondents disclosed the following facts:

Lim Yuen arrived at San Francisco November 22, 1908.   He was admitted as the minor son of Lim Jew (Kew), a Chinese merchant, lawfully domiciled and resident at Oakland, Cal., in the United States. The facts in regard to his status were investigated and determined by the Commissioner of Immigration at San Francisco.   He was admitted December 14, 1908.   These facts appear upon his certificate, and the records on file in the office of the Commissioner of Immigration at Washington.   His photograph was attached to the certificate.   From a preliminary statement, taken by the immigrant inspector at Wilmington, N. C., on January 6, 1914, and the examination of respondent on the hearing, it appears:   That respondent was born at Bock Jop Village, China.   That he resided at Oakland, attending school for two years after his admission.   Has been in Wilmington, N. C., since that time.   Cannot speak English.   Has been working at the Chinese laundry of Sam Lee, in Wilmington, N. C.   He is more than 21 years of age.   His father resides at Oakland, Cal., engaged as a merchant.

Lam Gong's certificate shows that he was admitted at San Francisco as the minor son of a Chinese merchant, Lim Jew (Lim Kew), December 27, 1907.   He is the brother of Lim Yuen.   Upon his examination, it appears that he was born in China.   His father was, when

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

respondent was admitted, and is now, a Chinese merchant, residing at Oakland, Cal. Respondent remained with him two months; came to Wilmington, N. C. Father gave him money. Has been in Wilmington about six years. When he came to Wilmington, he attended school—employed a teacher—more than a year. Attended Sunday school until a year ago. He can write some simple words in English; wrote in presence of court. Multiplied some figures. Spoke in English. Is now working in laundry of Sam Lee. Is about 21 years of age.

Chan See Jock's certificate shows that he was admitted at San Francisco August, 1909, as the minor son of Chan Ching Bor, Chinese teacher, lawfully domiciled in the United States. He states that his father resided at Oakland, Cal., was a teacher in Chinese school. Attended his father's school two years. Never attended English school. Can read and write English. Has been in Wilmington, N. C., two years. Works in Sam Lee's laundry.

The government introduced the certificates of entry and the records at Washington, all of which are regular. The affidavit charges that the respondents are Chinese laborers, not in possession of the certificates required by the statutes. The certificates held by them are not attacked for fraud. The government, however, insists that, if upon the hearing it appeared that they are unlawfully in, and not entitled to remain in, the United States, they should be deported; that no special form of complaint is required. This position is sustained by the authorities cited in the government's brief. Respondents resist an order of deportation upon the ground that, having been admitted as minor sons of a Chinese merchant, and teacher, then and now, lawfully domiciled in the United States, they have not, by becoming laborers in a laundry, as disclosed by the evidence, forfeited their right to remain; that they are not "unlawfully in the United States." The case is relieved of any technical difficulties. The essential facts are disclosed by the record and the uncontroverted testimony. That they were entitled to admission, as the minor sons of a Chinese merchant and teacher, is settled by the decision of the Supreme Court in United States v. Mrs. Gue Lim, 176 U. S. 459, 20 Sup. Ct. 415, 44 L. Ed. 544, in which it is held that the wife and minor children of a Chinese merchant, resident here, are entitled to be admitted into the United States. So, the Rules of the Department, governing admission of Chinese, provide that:

"The admissible classes are teachers, students, travelers for curiosity or pleasure, and merchants and their lawful wives and minor children." Rule 2.

It is not contended that the fact upon which they were permitted to enter the United States was not truthfully set forth and correctly found, nor is it denied that their fathers are, at this time, entitled to and do remain here, engaged as merchant and teacher. Does the fact that respondents have engaged, and are now engaged, in employment as laborers in a laundry, forfeit their right to remain here?

In United States v. Yee Quong Yuen, 191 Fed. 28, 111 C. C. A. 500 (C. C. A. 8th Cir.), it was held that a Chinese who had entered the

country as the minor son of a merchant was not subject to deporta-- tion because he temporarily engaged as a laborer in a laundry. It was said by Adams, Circuit Judge:

"The appellee's status and right of residence in this country were fixed by his lawful entry while a minor son of his father, who then resided here as a Chinese merchant. Presumptively this status and this right remained with him there afterwards. His father was a merchant in Salt Lake City where the boy came. He has continued to be such a merchant from that day to this. He has never left the country with the intention of abandoning his business here, and has never returned to China with the intention of remaining there. His boy, although a minor when he landed on our shores, was old enough to begin his life's work, and the father, for reasons of his own, deemed Denver a more promising place for him than Salt Lake City, and established him in the business of a merchant at that place. He was unsuccessful. He did not abandon his father, nor did his father abandon nor abdicate his duty of care and protection of him. While they were waiting after their first unsuccessful venture for an opportunity to engage in another business, the father supplied him with expense money. The worst of his offending was that he worked for his board at a laundry for a few months prior to his arrest, and while he and his father were attempting to find a new business for him."

He was discharged.

In United States v. Foo Duck, 172 Fed. 856, 97 C. C. A. 204, it appeared that respondent entered, when 16 years of age, as the minor son of a Chinese merchant, lawfully domiciled in the United States, without trick, deception, or fraud, under a certificate, and after arriving at full age worked as a laborer. Morrow, Circuit Judge, said:

"There is no fraud charged against the appellant (appellee) in obtaining the certificate under which he was admitted into the United States; nor is there any question raised as to his having been a student both before and after his arrival into the United States. It is not questioned that he is, and was at the time of his arrival in this country, a son of a merchant domiciled in this country. He was therefore lawfully admitted into the United States. The contention of the government is that, notwithstanding these facts, the appellant (appellee) should be deported because after he arrived in this country 'he worked as a cook and waiter at different times for several years.' * * * When he came to this country, he was 16 years of age. He is now over 23 years old. He has been here over seven years, five of these years he was a minor, and all of these years he was the son of a merchant residing and doing business in this country. Do these facts place the appellant (appellee) in the excluded class and subject him to deportation?"

The learned judge answers the question in the negative, giving cogent reasons for his conclusion. He points out the distinction between the case of an entry secured by fraud or misrepresentation as, where one, claiming to be a merchant and securing a certificate, as such, immediately becomes a laborer, and a case like this, in which the defendant is in truth in the admissible class. It is manifest that the learned judge did not regard this decision as conflicting with that rendered by him in Chain Chio Fong v. U. S. 133 Fed. 154, 66 C. C. A. 220, stressed by counsel for the government. The distinction between them is clear. In the Gue Lim Case, supra, Judge Peckham says:

"When the fact is established to the satisfaction of the authorities that the person claiming to enter, either as wife or minor child, is in fact wife or child of one of the members of a class mentioned in the treaty as entitled to enter, then that person is entitled to admission without the certificate."

It is not insisted, by respondents, that the certificate is conclusive upon the government. It seems that it does not relieve the respondents of the burden of showing their right to enter and remain, if called into question. The respondents here are conceded to have been within the admissible class, at the time of their entry. The authorities seem to uniformly hold that if a Chinaman is lawfully domiciled here, as a merchant, either by reason of having been a resident at the date of the treaty, or enactment of the exclusion acts, or by reason of having been admitted under a certificate, without fraud, he does not become subject to deportation because he thereafter becomes a laborer. The opinion of Judge Lowell in Re Chin Ark Wing (D. C.) 115 Fed. 412, is to that effect. In re Yew Bing Hi (D. C.) 128 Fed. 319, he says:

"Speaking generally, the Chinese Exclusion Acts are directed to prevent the unlawful coming of Chinese into the United States, and to remove those who have come in unlawfully."

After noting the several statutes, he says:

"Thus far no indication appears that a Chinaman who has lawfully entered the United States may not change his occupation after entry without risk of deportation. * * * Taken as a whole, the legislation appears not to intend the deportation of any Chinaman who lawfully entered the United States, and, since his entry, has complied with every applicable provision of the statute."

In United States v. Leo Won Tong, 132 Fed. 190, Judge Rogers says:

"The manifest purpose of Congress was to prevent Chinese laborers from coming into this country. Laborers already in the country were not to be expelled if they complied with the terms of the statute by taking out their certificates as laborers, and no provision was made for the expulsion of merchants, nor was there any provision made for certificates being granted to merchants, nor does the statute which defines what a laborer is, or what a merchant is, make any provision for a change of status from a merchant to a laborer. If it was the intention of Congress that when a merchant lawfully in the country at the passage of the act should cease to be a merchant, and become a laborer, he should be deported, provision should have been made therefor. It made no such provision, and the presumption ought to be that it did not so intend. The prevention of Chinese laborers from coming into the country is quite a different thing from deporting a merchant who has failed in business, and from necessity becomes a laborer, and especially after the passage of the act and the expiration of the period of limitation within which a laborer had the right to apply for a certificate of residence." U. S. v. Louie Juen, 128 Fed. 522; U. S. v. Fong Sen (D. C.) 205 Fed. 398.

These, and other, expressions of federal courts, while not determinative of the instant case, in respect to which the well-prepared brief for the government states "no case has yet arisen in which the question here involved has existed, clearly and uncomplicated with other issues," are persuasive in maintaining the view that a Chinaman lawfully admitted is not subject to deportation because of a change in his employment. The admission, free from fraud, or other invalidating element, entitles a Chinaman, under existing treaty, to "all the rights and privileges, immunities and exemptions which are accorded to the citizens of the most favored nation." Article 2, Treaty 1880.

It is insisted that the decisions of the courts in the construction and enforcement of the Chinese exclusion acts "show an evolution of the law towards extreme strictness." It is said that this is because of "constant evasion." There is here, however, no question of evasion in respect to the admission of respondents; they have made no false statement of their status for the purpose of obtaining admission; the claim upon which they were admitted, as the minor sons of a Chinese merchant, and teacher, lawfully resident in the United States, is conceded. It is true that, by section 12, Act of 1884 (Act July 5, 1884, c. 220, 23 Stat. 117 [U. S. Comp. St. 1901, p. 1310]), it is provided that "any Chinese person found unlawfully within the United States" shall be deported, etc. Section 13, Act 1888 (Act Sept. 13, 1888, c. 1015, 25 Stat. 479 [U. S. Comp. St. 1901, p. 1317]), contains the same language.

So the burden of proof is put upon the Chinaman arrested and brought before a judge, etc., to "establish, by affirmative proof, to the satisfaction of such judge, etc., his lawful right to remain in the United States." None of these provisions, nor others of like tenor, afford aid in the solution of the question presented by this record. Resort must be had to the language of the Treaty of Nov. 17, 1880, 22 Stat. 826 (article 2) and the acts of Congress, passed in pursuance thereof, as interpreted by the Supreme Court. These, as we have seen, entitled the respondents to admission. This is recognized by the Department in the Rules and Regulations made for the administration and enforcement of the act, defining admissible classes. Rule 2. It is strongly insisted, however, that the several acts of Congress, upon the subject, must be so interpreted as to repress the evil and advance the remedy; that is, prevention of the residence of Chinese engaged in laboring and their removal by deportation. Attention is called to the language of Judge Ross in U. S. v. Chun Hoy, 111 Fed. 899, 50 C. C. A. 57. The learned judge was there discussing the question of fact whether the defendant was within the admissible class, and, in doing so, enforcing the statutory burden of proof. It is further insisted that, as respondents were admitted by reason of the status of their fathers, they lost such status by abandoning the home and casting off the paternal custody and control, thus becoming liable to deportation, if they engaged in unlawful labor. To sustain this contention, it is urged that the admissibility of wives and minor sons is not based upon any language found in the statute or in the treaty, but to an interpretation of the court. That this interpretation is based upon the fact that the Chinese merchant, admitted under the treaty, is entitled to the society of his wife and the custody of his children; that, upon the reason of the thing and laws of universal application, it should be presumed that the wife and minor children were intended to come within the admissible classes by reason of their relationship; that, while this interpretation of the court should be given a fair construction, it should not be extended so as to confer the right of continued residence when the reason upon which it is based no longer exists.

In U. S. v. Joe Dick (D. C.) 134 Fed. 988, the defendant entered as the minor son of a Chinese merchant domiciled here. During his minority, the father returned to China, leaving the son here—employed as a laborer. Judge McPherson held that, as the father had ceased to reside here, the son was not entitled to remain as a laborer. He said whether he could have acquired an independent status for himself as a laborer during his minority, if his father had remained in the United States and had gone on with his business, need not be determined. The learned judge was of the opinion that, as the father had ceased to be a merchant, abandoned the son, and returned to China, the "privilege ended with the disappearance of the facts on which it was founded." It is also noted that, the son entered, and the father left the country, during the period within which the son was entitled to register and he failed to do so. Here the respondents came subsequent to the expiration of that period. The cases are not, in other respects, analogous. Here, the status of the father, upon which the sons were admitted, continues; so that whatever right the sons acquired from this status remains intact, unless forfeited by them. In the absence of any authoritative decisions we must endeavor to find, by interpretation or construction of the language used, the intention of Congress. The statutes must be read in the light of the treaty, the construction of the Supreme Court. Thus read, we find it agreed between the two governments.

"Article 1. Whenever in the opinion of the government of the United States, the coming of Chinese laborers to the United States, or their residence therein, affects or threatens to affect the interests of that country, or to endanger the good order of said country or of any locality within the territory thereof, the government of China agrees that the government of the United States may regulate, limit, or suspend such coming or residence, but may not absolutely prohibit it. The limitation or suspension shall be reasonable and shall apply only to Chinese who may go to the United States as laborers."

"Art. 2. Chinese subjects, whether proceeding to the United States as teachers, students, merchants or from curiosity (with their lawful wives and minor children), * * * shall be allowed to go and come of their own free will, and accord, and shall be accorded all of the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation."

The legislation which has been, from time to time, enacted pursuant to this treaty, and changes made therein, not material to be noted, has been, in numerous decisions, sustained by the Supreme Court. Rigid requirements have imposed, by statutes, upon Chinese charged with coming into, or being within, the United States, to show as matter of fact that they have been lawfully admitted and lawfully remain in the United States. These have been sustained. In enforcing these statutory requirements, the courts have given full force and effect to the legislative will and policy to which they give expression. In the construction of the statutes dealing with the asserted right to remain free from deportation, where the facts are established, the courts have been guided by the well-settled rule that the will of the Congress must be ascertained and enforced by resorting to the same canons of interpretation used in the construction of other statutes. No purpose is found in the decisions to give a strained or forced construction to the

statutes or make their language bear any other than a reasonable construction, to effectuate either a real, or supposed, public policy. This is manifested by the language of the court in Gue Lim, supra. It is said, quoting the Chief Justice, in Lau Ow Bew v. U. S., 144 U. S. 47, 59, 12 Sup. Ct. 517, 520 (36 L. Ed. 340):

"Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust and absurd conclusion."

Mr. Justice .Peckham, after quoting the language of the treaty, and declaring that the statute must be read in the light thereof, says:

"It is impossible to entertain the belief that the Congress of the United States, immediately after the conclusion of a treaty between this country and the Chinese Empire, would, while assuming to carry out its provisions, pass an act which violated or unreasonably obstructed the obligation of any provision of the treaty."

So Mr. Justice Harlan, in Chew Heong v. U. S., 112 U. S. 536, 5 Sup. Ct. 255, 28 L. Ed. 770, says:

"Aside from the duty imposed by the Constitution to respect treaty stipulations, when they become the subject of judicial proceedings, the court cannot be unmindful of the fact that the honor and the people of the United States is involved in every inquiry whether rights secured by such stipulations shall be recognized and protected."

The conclusion of the court is thus stated:

"We ought therefore to so construe the act, if it can reasonably be done, as to further the execution, and not to violate the provisions, of the treaty."

The right of the respondents to admission, upon the facts found by the Commissioner who issued the certificates, and the status being found to exist then, and to continue until this time, may the court read into the law the limitation that, upon arriving at full age or, engaging as laborers, the right to remain ceased? It is not so written into the statute. To find that such was the intention of Congress, we must go outside the language used. If permitted to indulge in speculation, it might not unreasonably be suggested that, in the opinion of Congress, the continued residence of minor children of Chinese merchants and teachers, after arriving at their majority, did not "affect, or threaten, the interest of the country, or endanger the good order of said country." Hence, it was not intended to declare their "residence," thereafter, unlawful. It may be that Congress was of the opinion that, while the "coming of Chinese laborers to the United States" had an effect against which the treaty provided, minor children, remaining after reaching their majority, was not objectionable. If it was intended that, upon the manumission of the minor children, their continued residence was to be deemed unlawful, it would seem that Congress would have so enacted. Again, if it was intended that minor children of the admitted classes should be permitted to remain after their emancipation by age, it would not be consistent with either a universal policy, or the laws of the states, in which they must reside, to impose upon them the burden of idleness; thereby becoming, in many instances, subject to the vagrancy laws of the state.

While it is true, as suggested by counsel, that respondents were admitted, upon a "communicated status," the minor sons of their parents, it does not follow that, when their right to remain is challenged, a different rule of construction of the statutes and of the decision of the Supreme Court is to be applied than if they were admitted upon some other legal status. The reasons assigned by the court for its construction of the treaty and the statutes passed pursuant to it have been recognized as satisfactory to the Congress by acquiescence; they appeal to the feelings of humanity and a fair construction of the language of the law.

Attention is called to Departmental Rule 19, which provides the form of the certificate issued to all Chinese persons admitted, in which it is declared that:

"The certificate is issued only for the protection and identification of Chinese of the exempt classes, only so long as such persons shall retain their exempt status, and are not transferable."

It is not perceived how this rule advances the argument, or throws any light upon the ultimate question to be decided, whether the respondents retain their exempt status. That answer must be found in the construction of the treaty and statutes, and not in the rules of the Department intrusted with its administration although due consideration will always be accorded the construction put upon statutes by the Department to which their administration is intrusted. This rule does not profess or attempt to construe the law; it is manifest that, without it, the certificate would have no other effect than is given it by the rule.

Attention is also called to Departmental Rule 23, which directs that:

"Chinese found in the United States engaged in laboring pursuits and not having in their possession a certificate issued under either the act of May 5, 1892, or the act of November 3, 1893, or other satisfactory evidence of their right to be and remain in the country, are subject to arrest and deportation."

This rule neither adds to, takes from, or construes the statutes. It is simply declaratory, and is manifestly correct. It imposes the duty on the officer, making the arrest, to give the Chinaman "full opportunity to produce the certificate, or other evidence before his arrest, etc." This right is "to be always accorded." That was done by the intelligent and efficient inspector in these cases.

The respondents were admitted when between the ages of 14 and 16 years. As they appeared before the court, they were dressed, and wore their hair in the manner and style of young men of their age and station in life of American nativity; they appeared to be sober, industrious, law-abiding, and answered the questions put to them, either through the interpreter or personally, with frankness and fair intelligence. It is conceded by the government that no authoritative decision directly "in point" is to be found. A careful examination of the cases cited and of the statutes, as construed by the Supreme Court, brings me to the conclusion that Congress has not placed any limitation upon the right of persons admitted, as minor children of Chinese merchants, teachers, etc, lawfully domiciled here, to remain in the United States, after their manumission, or limitation, upon their right

to engage as laborers in a laundry. In the absence of such statutory limitation, I am not authorized to create one. Independent of the want of authority to do so, manifest, practical difficulties would present themselves, if it were attempted. I am unable to find that the respondents secured ·their admission by fraud. They made no statement which .was not true.

An order may be drawn discharging the respondents from custody.