## UNITED STATES ex rel. LINKLATER v. COMMISSIONER OF IMMIGRATION AT ELLIS ISLAND.

District Court, S. D. New York. December 5, 1929.

Shorr, Brodsky & King, of New York City (Carol Weiss King, of New York City, of counsel), for relator.

The United States Attorney (George B. Schoonmaker, of New York City, of counsel), for respondent.

WOOLSEY, District Judge. The writ is sustained, and the relator is ordered discharged.

There is, apparently, not any question but that the relator, a Scotchman, came first to the United States on July 4, 1907, from Victoria, British Columbia, and entered the United States at Seattle, and that shortly afterwards he settled in Portland, Or. He has, therefore, lived in the United States for 22 years, and the many letters written on his behalf to the Department of Labor by various citizens of Oregon, including the two United States Senators from Oregon, the Governor of the State, the Bishop of the Diocese of Oregon, judges, state legislators, officers of state departments, including the Commissioner of Labor for Oregon, and members of the bar, the church, and the city government of Portland, abundantly testify that he bears an excellent reputation in the state of his chosen habitat, whether his presence there was lawful or unlawful, and notwithstanding the two instances of false swearing which he admits and with which I shall hereinafter deal.

The material facts in this challenging case are as follows:

For some time prior to July 4, 1907, the relator, who had been a sailor in the British Merchant Marine, was stopping at Victoria, British Columbia, with his brother Peter Linklater, a merchant tailor of established position there, who has since been in turn police commissioner and license commissioner of Victoria. After talking the matter over, the two brothers decided that the relator would do well to go to the United States to seek his fortune. One Burford, who died before proceedings against the relator were begun, was then the United States immigration inspector at Victoria. He was an intimate friend of Peter Linklater, and arrangements for the relator's entry for permanent residence in the United States were discussed with Burford.

Peter Linklater told Burford that his brother was going to the United States permanently, and Burford said everything was to be done in the proper manner. In answer to inquiry about payment of head tax, Peter Linklater testified that: "As far as I know it was paid. I don't remember just getting out the money only I know it was all to be fixed in the proper manner or as Burford desired it."

On July 4, 1907, the day of the relator's sailing from Victoria to Seattle, Peter Linklater, being unable to go with his brother to the steamer, sent his assistant Cuzner to see him off. What happened at the steamer is thus described by Cuzner in his evidence on one of the hearings had herein: " * * * We met Mr. Burford but before we got down to the gang plank stopped to talk to him, then the boat whistled and Henry [the relator] started for the boat. Mr. Bechtel was standing at the bottom of the gang plank, he was an immigration officer, he was assistant to Mr. Burford here. * * * We shook hands with Henry, wished him good luck, and Burford and I staid there and Henry started for the gang plank and I remember distinctly Bechtel on his way halting him and Burford said 'All right, Bechtel, he is all right.' "

Both Cuzner and Peter Linklater testified that Burford must have known that Henry Dodd Linklater was coming here for permanent residence. The latter testified that the relator's head tax was paid, and that he had a slip to give to the immigration inspector at the steamer. This was apparently his "certificate of admission." There is a suggestion that the head tax was paid by crediting Burford with the amount thereof in a running account which he had with Peter Linklater. The relator, therefore, seems to have complied, on his part, with the provisions of the Immigration Act of February 20, 1907, § 32 (34 Stat. 908), and Rules 1 and 25 promulgated in pursuance thereof.

After coming to this country, the relator worked at first in the Coast Guard Service in Washington and Oregon. Almost immediately he applied for naturalization, but got his first papers only. He continued with the Coast Guard for two or three years, after, which, in 1910, he applied for a position as a mail carrier. In his sworn application for this position Linklater falsely swore that he was born in the United States, and at his first examination by an immigration inspector at the commencement of the proceedings, which resulted in the warrant for deportation, he admitted this fact. Asked why he made these untruthful representations, he replied: "In order to get the position, that is the only way I could get it."

After this application Linklater took a civil service examination successfully and be-

came a mail carrier. He worked for the Post Office for about two years, then for a short time he went into business for himself doing odd jobs of whitewashing and the like.

After that he applied for a position in the Portland Fire Department, and in the application he made therefor, on August 10, 1914, again swore falsely that he was born in the United States.

The relator visited Victoria in 1909 and in 1924. On both these occasions when he returned he saw immigration officials and was questioned at length by them, and passed for entry.

The only trip which he made after the Immigration Act of 1924 (43 Stat. 153) went into effect was a trip which he made to Alaska during his vacation in the summer of 1926, whilst he was still employed by the Portland Fire Department. He went then for a vacation from Portland, Or., to Alaska and return. He had a round-trip ticket, and on his way back from Alaska he stopped for a few days at Victoria to see his brother Peter Linklater. On his return to the United States from this trip, proceedings before the immigration authorities, apparently inspired by enemies of the relator in the Portland Fire Department, were begun and have resulted in the pending deportation order which has been affirmed by the Secretary of Labor.

The position taken by the Department of Labor is that the relator must be held not to have entered the United States lawfully in 1907 because there is not any record in the files of the Immigration Department of his admission.

In other words, the Department has taken the position that the absence of a record of the relator's admission in 1907 is evidence which now justifies its action in deporting him, because in 1926, when he returned from Victoria, British Columbia, he did not have an immigration visa.

■■ I do not agree. Failure to have a record of the relator's admission so soon after the Act of February, 1907, requiring records, is even less significant than it might be at a later date.[1] It is not evidence, in any event, of unlawful entry, and put at its highest value it merely increases the burden of proof, put on the relator by section 23 of the Immigration Act of 1924 (8 USCA § 221), to establish his lawful entry.

[1] Confirming the correctness of these views, note the fact—brought to my attention since this opinion was typed—that for five years after the Naturalization Act of June 29, 1906, there were not any records made on the American side of the Canadian frontier of the entry of aliens from Canada. See Congressional Record, vol. 70, pt. 5, p. 4947, and see, also, page 4779.

The failure to have a record may have been due to negligence or mistake of the employees of the very Department which is now passing on his case in a quasi judicial capacity. In this case it was probably due to negligence or forgetfulness on Burford's part.

It is obvious that if the evidence of the relator is satisfactory regarding his entry he should not be excluded on such a ground.

I consider that the relator has amply sustained the burden of proof which is laid on him under section 23 of the Immigration Act of 1924, to establish his lawful entry.

■ If he entered lawfully in 1907, as I find he did, and was a permanent lawful alien resident of the United States, he did not need to have any visa or passport in order to visit Canada and return. It is so provided under the Immigration Act of 1924 § 13(b), 8 USCA § 213(b), and Executive Order No. 4476, issued July 12, 1926, par. 1, subd. 2, which reads as follows: "Aliens who have previously been admitted legally into the United States, have departed therefrom and returned within six months, not having proceeded to countries other than Canada, Newfoundland, St. Pierre Miquelon, Bermuda, Mexico, Cuba, and other Islands included in the Bahama and Greater Antilles groups, are not required to present passports, visas, or permits to reenter."

This disposes of the first alleged ground of deportation.

■ The second ground for the relator's deportation is that he committed a crime involving moral turpitude, to wit, perjury, before he entered the United States.

Although perjury must be conceded to be a crime involving moral turpitude, I do not think that the situation here comes within the provisions of section 19 of the Immigration Act of February 5, 1917 (8 USCA § 155).

The object of section 19 was to exclude undesirables, whom this government under our system of law could not punish for crimes committed outside of our territory. It was not, I think, intended to be a basis for the deportation of aliens who had committed crimes in this country for which they were punishable here—at least until such punishment had definitely branded them as undesirables. To put it otherwise, deportation was not made by section 19 an alternative penalty in respect of every crime which an alien might admit having committed within our jurisdiction.

If it be assumed that the relator committed perjury on the two occasions above mentioned, the crimes were both committed in Oregon. The first alleged perjury in respect

of the application for a position with the Post Office, committed in 1910, was subject to be prosecuted by the United States attorney for Oregon as an offense against the United States, and the second alleged perjury in respect of the application for employment in the Fire Department at Portland, Or., in 1914, was an offense against the laws of Oregon and was subject to prosecution by the district attorney for Multnomah county, Or., of which the city of Portland is the county seat, and in which the crime was committed.

If the relator had been prosecuted for these two crimes by the respective officials charged with prosecution for such crimes and had been found guilty of both or either of these crimes, he would have been punished therefor as the statutes of the United States and of Oregon may have respectively provided. But he was not prosecuted.

Assuming that the relator committed perjury on these two occasions, the crimes so committed were not in my opinion committed prior to his entry into the United States, whether his entry in 1907 was lawful or not. Such a construction of section 19 of the Immigration Act of February 5, 1917, is, I think, a forced construction of that section for the reasons which I have above indicated. As was said in Lau Ow Bew v. United States, 144 U. S. 53, at page 59 [12 S. Ct. 517, 520, 36 L. Ed. 340]: "Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion. Church of the Holy Trinity v. United States, 143 U. S. 457 [12 S. Ct. 511, 36 L. Ed. 226]; Henderson v. Mayor of New York, 92 U. S. 259 [23 L. Ed. 543]; United States v. Kirby, 7 Wall. 482 [19 L. Ed. 278]; Oates v. National Bank, 100 U. S. 239 [25 L. Ed. 580]."

But as I find that the relator entered the United States lawfully on July 4, 1907, I have a direct authority within which his case falls. That is the decision of the Circuit Court of Appeals for the Ninth Circuit in Wong Yow v. Weedin, 33 F.(2d) 377, 379, in which Judge Dietrich adopted the same construction of section 19 of the Act of February 5, 1917, as I do here, and, held, reversing the District Court for Washington, that a Chinaman, who was a legal resident of Oregon, could not be deported because he had committed bigamy under Oregon law by marrying a second wife in Oregon whilst his first wife was still living in China, and then, having gone to China, where his second wife died, had returned with his first wife to Oregon, and on proceedings to secure her admission had admitted the bigamy.