## LAU OW BEW *v.* UNITED STATES.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE
NINTH CIRCUIT.

No. 1458. Argued January 14, 1892. — Decided March 14, 1892.

By section 6 of the act of March 3, 1891, establishing Circuit Courts of Appeals, 26 Stat. 828, c. 517, the appellate jurisdiction not vested in this court was vested in the court created by that act, and the entire jurisdiction was distributed.

The words "unless otherwise provided by law," in the clause in that section which provides that the Circuit Courts shall exercise appellate jurisdiction "in all cases other than those provided for in the preceding section of this act, unless otherwise provided by law" were inserted in order to guard against implied repeals, and are not to be construed as referring to prior laws only.

It is competent for this court by certiorari to direct any case to be certified by the Circuit Courts of Appeals, whether its advice is requested or not, except those which may be brought here by appeal or writ of error.

Section 6 of the Chinese Restriction act of May 6, 1882, 22 Stat. 58, c. 126, as amended by the act of July 5, 1884, 23 Stat. 115, c. 220, does not apply to Chinese merchants, already domiciled in the United States, who, having left the country for temporary purposes, *animo revertendi*, seek to re-enter it on their return to their business and their homes.

THIS is a writ of certiorari for the review of a judgment of the Circuit Court of Appeals for the Ninth Circuit, affirming the judgment of the Circuit Court of the United States for the

Northern District of California, in a case of *habeas corpus*, which determined that Lau Ow Bew, the appellant, is a Chinese person forbidden by law to land within the United States, and has no right to be or remain therein, and ordered that he be deported out of the country, and transported to the port in China whence he came.

The proceedings in the Circuit Court are set out in the application for the certiorari, as reported in 141 U. S. 583. The case was heard and determined in that court upon an agreed statement of facts, as follows:

"It is hereby stipulated and agreed that the following are the facts herein:

"1st. That the said Lau Ow Bew is now on board the SS. Oceanic, which arrived in the port of San Francisco, State of California, on the 11th day of August, A.D. 1891, from Hong Kong, and is detained and confined thereon by Captain Smith, the master thereof.

"2d. That the said passenger is now and for seventeen years last past has been a resident of the United States and domiciled therein.

"3d. That during all of said time the said passenger has been engaged in the wholesale and importing mercantile business in the city of Portland, State of Oregon, under the firm name and style of Hop Chong & Co.

"4th. That said firm is worth $40,000, and said passenger has a one-fourth interest therein, in addition to other properties.

"5th. That said firm does a business annually of $100,000, and pays annually to the United States government large sums of money, amounting to many thousands of dollars, as duties upon imports.

"6th. That on the 30th day of September, A.D. 1890, the said passenger departed from this country temporarily on a visit to his relatives in China, with the intention of returning as soon as possible to this country, and returned to this country by the steamship Oceanic on the 11th day of August, A.D. 1891.

"7th. That at the time of his departure he procured satis-

factory evidence of his status in this country as a merchant, and on his return hereto he presented said proofs to the collector of the port of San Francisco, but said collector, while acknowledging the sufficiency of said proofs and admitting that the said passenger was a merchant domiciled herein, refused to permit the said passenger to land on the sole ground that the said passenger failed and neglected to produce the certificate of the Chinese government mentioned in section 6 of the Chinese Restriction Act of May 6, 1882, as amended by the act of July 5, 1884."

The Circuit Court rendered judgment September 14, 1891, (47 Fed. Rep. 578,) which, the case having been carried by appeal to the Circuit Court of Appeals for the Ninth Circuit, was on the 7th day of October, 1891, affirmed. (47 Fed. Rep. 641.)

On November 16, 1891, this court, upon the application of appellant, ordered that a writ of certiorari issue to the Circuit Court of Appeals requiring it to certify the case up for review and determination, under section six of the act to establish Circuit Courts of Appeals, approved March 3, 1891. (26 Stat. 826, 828, c. 517.)

The fifth article of the treaty concluded July 28, 1868, between the United States and China, known as the "Burlingame Treaty," (16 Stat. 739,) declares that:

"The United States of America and the Emperor of China cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects, respectively, from the one country to the other, for purposes of curiosity, of trade, or as permanent residents."

Article VI of that treaty is as follows:

"Citizens of the United States visiting or residing in China shall enjoy the same privileges, immunities, or exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation. And, reciprocally, Chinese subjects visiting or residing in the United States, shall enjoy the same privileges, immunities, and ex-

emptions in respect to travel or residence, as may there be enjoyed by the citizens or subjects of the most favored nation. But nothing herein contained shall be held to confer naturalization upon citizens of the United States in China, nor upon the subjects of China in the United States."

A supplementary treaty was concluded November 17, 1880, (22 Stat. 826,) which recites, among other things, in its preamble that, "whereas the Government of the United States, because of the constantly increasing immigration of Chinese laborers to the territory of the United States, and the embarrassments consequent upon such immigration, now desires to negotiate a modification of the existing treaties which shall not be in direct contravention of their spirit;" and articles I and II of which are as follows:

"Whenever in the opinion of the Government of the United States, the coming of Chinese laborers to the United States, or their residence therein, affects or threatens to affect the interests of that country, or to endanger the good order of the said country or of any locality within the territory thereof, the Government of China agrees that the Government of the United States may regulate, limit or suspend such coming or residence, but may not absolutely prohibit it. The limitation or suspension shall be reasonable and shall apply only to Chinese who may go to the United States as laborers, other classes not being included in the limitations. Legislation taken in regard to Chinese laborers will be of such a character only as is necessary to enforce the regulation, limitation or suspension of immigration, and immigrants shall not be subject to personal maltreatment or abuse.

"Chinese subjects, whether proceeding to the United States as teachers, students, merchants or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities and exemptions which are accorded to the citizens and subjects of the most favored nation."

The sixth section of the act of May 6, 1882, entitled "An

act to execute certain treaty stipulations relating to Chinese," (22 Stat. 58, c. 126,) as amended by the act of July 5, 1884, (23 Stat. 115, c. 220,) the matter inserted in amendment being italicized, and the matter stricken out being in brackets, reads as follows :

"Sec. 6. That in order to the faithful execution of [articles one and two of the treaty in] *the provisions of* this act [before mentioned,] every Chinese person, other than a laborer, who may be entitled by said treaty [and] *or* this act to come within the United States, and who shall be about to come to the United States, shall *obtain the permission of and* be identified as so entitled by the Chinese government, *or of such other foreign government of which at the time such Chinese person shall be a subject,* in each case [such identity] to be evidenced by a certificate issued [under the authority of said] *by such* government, which certificate shall be in the English language [or (if not in the English language) accompanied by a translation into English, stating such right to come] *and shall show such permission, with the name of the permitted person in his or her proper signature,* and which certificate shall state the *individual, family, and tribal* name *in full,* title or official rank, if any, the age, height, and all physical peculiarities, former and present occupation or profession, *when and where and how long pursued,* and place of residence [in China] of the person to whom the certificate is issued, and that such person is entitled [conformably to the treaty in] *by* this act [mentioned] to come within the United States. *If the person so applying for a certificate shall be a merchant, said certificate shall, in addition to above requirements, state the nature, character and estimated value of the business carried on by him prior to and at the time of his application as aforesaid : Provided, That nothing in this act nor in said treaty shall be construed as embracing within the meaning of the word 'merchant' hucksters, peddlers or those engaged in taking, drying or otherwise preserving shell or other fish for home consumption or exportation. If the certificate be sought for the purpose of travel for curiosity, it shall also state whether the applicant intends to pass through or travel within the*

*United States, together with his financial standing in the country from which such certificate is desired. The certificate provided for in this act, and the identity of the person named therein shall, before such person goes on board any vessel to proceed to the United States, be vised by the indorsement of the diplomatic representatives of the United States in the foreign country from which said certificate issues, or of the consular representative of the United States at the port or place from which the person named in the certificate is about to depart; and such diplomatic representative or consular representative whose indorsement is so required is hereby empowered; and it shall be his duty, before indorsing such certificate as aforesaid, to examine into the truth of the statements set forth in said certificate, and if he shall find upon examination that said or any of the statements therein contained are untrue it shall be his duty to refuse to indorse the same.* Such certificate *vised as aforesaid* shall be prima facie evidence of the fact set forth therein, and shall be produced to the collector of customs [or his deputy] of the port in the district in the United States at which the person named therein shall arrive, *and afterward produced to the proper authorities of the United States whenever lawfully demanded, and shall be the sole evidence permissible on the part of the person so producing the same to establish a right of entry into the United States; but said certificate may be controverted and the facts therein stated disproved by the United States authorities.*"

On the third of July, 1890, the Treasury Department issued certain instructions regarding the reëntry into the United States of Chinese persons after a visit to China, one of which is as follows :

"Chinamen who are not laborers, and who may have heretofore resided in the United States, are not prevented by existing law or treaty from returning to the United States after visiting China or elsewhere. No certificates or other papers, however, are issued by the department, or by any of its subordinate officers, to show that they are entitled to land in the United States, but it is suggested that such persons should, before leaving the United States, provide themselves

with such proofs of identity as may be deemed proper, show-
ing that they have been residents of the United States, and
that they are not laborers, so that they can present the same
to and be identified by, the collector of customs at the port
where they may return." Syn. Treas. Dec. 1890, 253, 254.

*Mr. J. Hubley Ashton* for appellant. *Mr. Thomas D.
Riordan* was with him on the brief.

*Mr. Assistant Attorney General Parker* for appellee.

The petitioner left the United States September 30, 1890,
and came into the port of San Francisco August 11, 1891,
having been out of the United States more than ten months.
During this time he was living in the country of his birth and
had resumed his domicil there, and had thus voluntarily placed
himself within the operation of the statutes of the United
States, excluding Chinese immigrants.

Immediately before going on board the Oceanic at Hong
Kong to return to the United States, he was a " Chinese per-
son, other than a laborer," and was entitled by the terms of
the treaty " to come within the United States." So far as his
purpose or intent could control, he was " about to come to the
United States " from China. But he could come only in accord
with our laws. Therefore, it was necessary, under the terms
of the amended act, that he should, before going on board,
" obtain the permission of and be identified as so entitled by
the Chinese government . . . to be evidenced by a certifi-
cate, issued by such government."

It is provided that the certificate shall be in the English
language, shall show such permission, the name of the permit-
ted person in his or her proper signature ; the name, family,
title and rank ; the physical description, the former and pres-
ent occupation or profession, and when, where and how long
pursued, and the place of residence of the person to whom the
certificate is issued, " and that he is entitled by this act to
come within the United States." And it is enacted that this
certificate " shall be the sole evidence permissible on the part

of the person so producing the same to establish a right of entry into the United States." But it is argued that Congress did not intend this act to apply to Chinese persons that had been doing business in the United States. It is submitted that the phraseology of the act controverts this argument. The general phrase is plain, and its scope is indicated by the expressed exception.

The act applies in terms to "every Chinese person" "other than a laborer," except those protected by the thirteenth section. An exception that recognizes the breadth of the general application is the exception as to diplomatic and other officers and their servants mentioned in section 13 of the act. These exceptions indicate that outside of them the words "every Chinese person" were used without a restriction, and that, subject to these exceptions, the requirements of the act apply to all Chinese persons.

This broad construction seems to be recognized by the phraseology of the first clause of section 15, which says, "that the provisions of this act shall apply to all subjects of China and Chinese, whether subjects of China or any other foreign power." The act applies in specific terms to "every Chinese person" not a Chinese laborer, or a diplomatic or other officer, or a servant of such officials. It cannot be claimed that subjects of the Emperor of China engaged in trade in this country are not "Chinese persons."

It is part of the case that Lau Ow Bew is not a Chinese laborer, a Government officer, or the servant of an official. It therefore appears plainly that he is one of the class that the law of the United States declares shall obtain and produce the certificate required by and described in section 6.

No better check to the laborer who seeks to come as a merchant, and who is ready to make his way by perjury, could be devised than to require the Chinese government to certify, in addition to the other facts required, "the nature, character, and estimated value of the business carried on by him prior to and at the time of his application."

In a case like that of *Lau Ow Bew* some hardship may arise from the law. In a case like that of *Wan Shing*, 140

U. S. 424, the fraud would be exposed and defeated at the port of shipment. It is therefore not unnatural that Congress should require of a person in China who claims to be engaged in trade in the United States, that he shall be identified and shown to be such by the Chinese government.

The whole scheme of section 6 is one to stop and turn back the multitude of Chinese laborers who pay no respect to our wishes or our laws, and who are prompt to employ fraud and perjury in order to place themselves in the ranks of competition in our labor markets. It does not prevent the coming of merchants or other entitled persons who have never been here. Neither does it preclude the return of merchants or other entitled persons domiciled here, or who have resided here.

Congress seeks by this section to execute the protective clauses of the treaty of 1880, which authorize the United States to restrict the coming of Chinese laborers. This legislation places such safeguards about the coming of all Chinese persons, not connected with diplomatic or official service, as experience has shown to be necessary to prevent the unlawful entry of large numbers of Chinese laborers. This Congress had the right to do, and having the right and power so to do, it was clothed with the right and power to determine the means that should be used to accomplish the result sought.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court:

Before proceeding to dispose of this case upon the merits the question of jurisdiction, although not argued by counsel, must receive attention.

The act of Congress of March 3, 1891, establishing Circuit Courts of Appeals and defining and regulating the jurisdiction of the courts of the United States, 26 Stat. 826, c. 517, was passed to facilitate the prompt disposition of cases in this court and to relieve it from the oppressive burden of general litigation, which impeded the examination of cases of public concern, and operated to the delay of suitors. *In re Woods,* 143 U. S. 202.

By section 4, "the review, by appeal, by writ of error, or otherwise, from the existing Circuit Courts shall be had only in the Supreme Court of the United States or in the Circuit Courts of Appeals hereby established according to the provisions of this act regulating the same."

By section 14, section 691 of the Revised Statutes, and section 3 of the act of February 16, 1875, c. 77, 18 Stat. c. 77, pp. 315, 316, and "all acts and parts of acts relating to appeals or writs of error inconsistent with the provisions for review by appeals or writs of error in the preceding sections five and six of this act," were repealed.

Under section 5, appeals or writs of error may be taken from the Circuit Courts directly to this court in six specified classes of cases, namely:

" [1] In any case in which the jurisdiction of the court is in issue; in such cases the question of jurisdiction alone shall be certified to the Supreme Court from the court below for decision. [2] From the final sentences and decrees in prize causes. [3] In cases of conviction of a capital or otherwise infamous crime. [4] In any case that involves the construction or application of the Constitution of the United States. [5] In any case in which the constitutionality of any law of the United States, or the validity or construction of any treaty made under its authority, is drawn in question. [6] In any case in which the constitution or law of a State is claimed to be in contravention of the Constitution of the United States."

By section 6, the Circuit Courts of Appeals "shall exercise appellate jurisdiction to review by appeal or by writ of error," final decisions of the Circuit Courts "in all cases other than those provided for in the preceding section of this act, unless otherwise provided by law." The appellate jurisdiction not vested in this court was thus vested in the court created by the act, and the entire jurisdiction distributed. *McLish* v. *Roff*, 141 U. S. 661, 666.

The words "unless otherwise provided by law" were manifestly inserted out of abundant caution, in order that any qualification of the jurisdiction by contemporaneous or subse-

quent acts should not be construed as taking it away except when expressly so provided. Implied repeals were intended to be thereby guarded against. To hold that the words referred to prior laws would defeat the purpose of the act and be inconsistent with its context and its repealing clause.

The section then provides that "the judgments or decrees of the Circuit Courts of Appeals shall be final in all cases in which the jurisdiction is dependent entirely upon the opposite parties to the suit or controversy, being aliens and citizens of the United States or citizens of different States; also in all cases arising under the patent laws, under the revenue laws, and under the criminal laws and in admiralty cases, excepting that in every such subject within its appellate jurisdiction the Circuit Court of Appeals at any time may certify to the Supreme Court of the United States any questions or propositions of law concerning which it desires the instruction of that court for its proper decision. And thereupon the Supreme Court may either give its instructions on the questions and propositions certified to it, which shall be binding upon the Circuit Courts of Appeals in such case, or it may require that the whole record and cause may be sent up to it for its consideration, and thereupon shall decide the whole matter in controversy in the same manner as if it had been brought there for review by writ of error or appeal. And excepting also that in any such case as is hereinbefore made final in the Circuit Court of Appeals it shall be competent for the Supreme Court to require, by certiorari or otherwise, any such case to be certified" for its determination as if brought up by appeal or writ of error. "In all cases not hereinbefore, in this section, made final there shall be of right an appeal or writ of error or review of the case by the Supreme Court of the United States where the matter in controversy shall exceed one thousand dollars besides costs."

By this section judgments or decrees in the enumerated classes of cases are made final in terms by way of the exclusion of any review by writ of error or appeal, while as to cases not expressly made final by the section, appeal or writ of error may be had of right, where the money value of the matter in controversy exceeds one thousand dollars besides costs.

The case before us is one of *habeas corpus*.   The jurisdiction
of the Circuit Court was not in issue, nor was the construction
or application of the Constitution of the United States in-
volved, nor the constitutionality of any law of the United
States, or the validity or construction of any treaty made
under its authority, drawn in question.   It did not fall within
either of the classes of cases which may be brought directly to
this court under the act, and was, therefore, properly carried
to the Circuit Court of Appeals.   And as a case of *habeas
corpus* is not one in which the matter in controversy involves
a money value, no appeal lies from that court under section
six.   *Kurtz* v. *Moffitt,* 115 U. S. 487.   But as the decree is
"made final" by the effect of the section in giving the Circuit
Courts of Appeals jurisdiction over that class of cases, we are
of opinion that it is reviewable upon certiorari, and that this
writ was providently issued.

In every case within its appellate jurisdiction, the Circuit
Court of Appeals may certify to this court any questions or
propositions of law in respect of which it desires instruction,
and this court may then require the whole record and cause
to be sent up ; and so it is competent for this court by certio-
rari to direct any case to be certified, whether its advice is re-
quested or not, except those which may be brought here by
appeal or writ of error, and the latter are specified as those
where the money value exceeds a certain amount, and which
have not been made final "in this section," that is, made final
in terms.   And as certiorari will only be issued where ques-
tions of gravity and importance are involved or in the interest
of uniformity of decision, the object of the act is thereby at-
tained.

We are brought, therefore, to the consideration of the ques-
tions arising upon the record.   Lau Ow Bew came to the
United States in 1874, and has been for seventeen years a resi-
dent thereof and domiciled therein, and during that period has
carried on a wholesale and importing mercantile business in
the city of Portland, Oregon.   On September 30, 1890, he
went to China for the purpose of visiting his relatives and with
the intention of returning as soon as possible, having pre-

viously procured the proper evidence of his status in this coun-
try as a merchant, in accordance with the regulations of the
Treasury Department of July 3, 1890. He took passage for
home at Hong Kong on the Oceanic, which reached San Fran-
cisco on August 11, 1891. Although it was admitted by the
collector that appellant was a merchant domiciled in the
United States, and the sufficiency of his proofs of identity was
acknowledged, yet the collector refused to permit him to land
on the sole ground that he failed and neglected to produce the
certificate of the Chinese government mentioned in section six
of the Chinese Restriction Act of May 6, 1882, as amended by
the act of July 5, 1884.

Does the section apply to Chinese merchants, already domi-
ciled in the United States, who, having left the country for
temporary purposes, *animo revertendi*, seek to reënter it on
their return to their business and their homes?

Nothing is better settled than that statutes should receive a
sensible construction, such as will effectuate the legislative in-
tention, and, if possible, so as to avoid an unjust or an absurd
conclusion. *Church of the Holy Trinity* v. *United States*, 143
U. S. 457; *Henderson* v. *Mayor of New York*, 92 U. S. 259;
*United States* v. *Kirby*, 7 Wall. 482; *Oates* v. *National Bank*,
100 U. S. 239.

In the case of *Low Yam Chow*, 13 Fed. Rep. 605, 609, it
was held by the Circuit Court for the District of California,
September 5, 1882, that Chinese merchants who resided, at
the time of the passage of the act of Congress of May 6, 1882,
in other countries than China, on arriving in a port of the
United States, were not required by that act to produce certifi-
cates of the Chinese government establishing their character
as merchants, as a condition of their being allowed to land,
but that their character as such merchants could be established
by parol evidence. And Mr. Justice Field, delivering the
opinion of the court, referring to the sixth section of the act,
said: "The certificate mentioned in this section is evidently
designed to facilitate proof by Chinese other than laborers,
coming from China and desiring to enter the United States,
that they are not within the prohibited class. It is not re-

quired as a means of restricting their coming. To hold that such was its object would be to impute to Congress a purpose to disregard the stipulation of the second article of the new treaty, that they should be 'allowed to go and come of their own free will and accord.'"

And Judge Deady, in the District Court for the District of Oregon, held, January 15, 1883, that the certificate provided for in section six was not the only competent evidence that a Chinese person is not a laborer, and, therefore, entitled to come to and reside within the United States, but that the fact might be shown by any other pertinent and convincing testimony. *In re Ho King*, 14 Fed. Rep. 724.

The amendatory act of July 5, 1884, enlarged the terms of the certificate, and provided that it should be the sole evidence permissible on the part of the person producing the same to establish a right of entry into the United States. This rule of evidence was evidently prescribed by the amendment as a means of effectually preventing the violation or evasion of the prohibition against the coming of Chinese laborers. It was designed as a safeguard to prevent the unlawful entry of such laborers, under the pretence that they belonged to the merchant class or to some other of the admitted classes. But the phraseology of the section, in requiring that the certificate of identification should state not only the holder's family and tribal name in full, his title or official rank, if any, his age, height and all physical peculiarities, but also his former and present occupation or profession, when and where and how long pursued, and his place of residence, and, if a merchant, the nature, character and estimated value of the business carried on by him prior to and at the time of his application for such certificate, involves the exaction of the unreasonable and absurd condition of a foreign government certifying to the United States facts in regard to the place of abode and the business of persons residing in this country, which the foreign government cannot be assumed to know, and the means of information in regard to which exist here, unless it be construed to mean that Congress intended that the certificate should be procured only by Chinese residing in China or

some other foreign country, and about to come for the first time into the United States for travel or business or to take up their residence.

Mr. Justice Field, in the case already cited, referring to the Chinese government, said: "That government could not be expected to give, in its certificate, the particulars mentioned of persons resident — some, perhaps, for many years — out of its jurisdiction. Neither the letter nor the spirit of the act calls for a construction imputing to Congress the exaction of a condition so unreasonable. . . . We repeat what we said in the case of *Ah Tie* and other Chinese laborers, that all laws are to be so construed as to avoid an unjust or an absurd conclusion; and general terms are to be so limited in their application as not to lead to injustice, oppression or an absurd consequence."

The section by its terms declares that "every Chinese person, other than a laborer, who may be entitled by said treaty or this act to come within the United States, and who shall be about to come to the United States, shall obtain the permission of and be identified as so entitled by the Chinese government, or of such other foreign government of which at the time such Chinese person shall be a subject," the permission and identification in each case to be evidenced by the certificate described.

But Chinese merchants domiciled in the United States, and in China only for temporary purposes, *animo revertendi,* do not appear to us to occupy the predicament of persons "who shall be about to come to the United States," when they start on their return to the country of their residence and business. The general terms used should be limited to those persons to whom Congress manifestly intended to apply them, and they would evidently be those who are about to come to the United States for the first time, and, therefore, might properly be required to apply to their own government for permission to do so, as also to so identify them as to distinguish them as belonging to the classes who could properly avail themselves of such leave.

By general international law, foreigners who have become

domiciled in a country other than their own, acquire rights and must discharge duties in many respects the same as possessed by and imposed upon the citizens of that country, and no restriction on the footing upon which such persons stand by reason of their domicil of choice, or commercial domicil, is to be presumed; while by our treaty with China, Chinese merchants domiciled in the United States, have, and are entitled to exercise, the right of free egress and ingress, and all other rights, privileges and immunities enjoyed in this country by the citizens or subjects of the " most favored nation."

There can be no doubt, as was said by Mr. Justice Harlan, speaking for the court in *Chew Heong* v. *United States*, 112 U. S. 536, 549, that "since the purpose avowed in the act was to faithfully execute the treaty, any interpretation of its provisions would be rejected which imputed to Congress an intention to disregard the plighted faith of the government, and, consequently, the court ought, if possible, to adopt that construction which recognized and saved rights secured by the treaty."

Tested by this rule it is impossible to hold that this section was intended to prohibit or prevent Chinese merchants, having a commercial domicil here, from leaving the country for temporary purposes and then returning to and reëntering it, and yet such would be its effect, if construed as contended for on behalf of appellee.

In the case of *Ah Ping*, 23 Fed. Rep. 329, 330, it was held that the section did not apply to Chinese subjects, residents of the United States, departing for temporary purposes of business or pleasure; and the late Judge Sawyer delivering the opinion of the court said : " As to those domiciled in foreign countries, there is no ready means in this country for their identification. In the countries whence they propose to come, the means of ascertaining the facts are at hand; hence the provision. As to those resident or domiciled in this country, we have ourselves the best means of identification; while as to many of them, even in their native country, and much less when they are temporarily in other foreign countries, there is no practicable means of either identification, or for procuring

the certificate prescribed. The United States statutes do not now, nor have they ever, required or provided for the issue of any certificate in this country to resident Chinese, other than laborers, who are about to depart temporarily, for business or pleasure, either to China or other foreign countries. There are many Chinese merchants in California who have been domiciled in the State from 20 to 35 years. Our own means of identification of such persons are greatly superior to those of any other country, even that of their nativity. To require such parties, every time they go to another country, to perform the required acts abroad, would be utterly impracticable, and practically tantamount to an absolute refusal to permit their return."

The question has been ruled in the same way by the Treasury Department on many occasions; by Secretary Folger, March 14, 1884, Syn. T. D. 1884, 128; by Secretary Gresham, September 25, 1884, Id. 400; by Secretary McCulloch, January 14, 1885, Id. 1885, 26; by Assistant Secretary French, December 2, 1884; by Assistant Secretary Maynard, November 7, 1888; and by Acting Secretary Batcheller, in the instructions of July 3, 1890, already given.

No other rule in this respect was laid down by Congress in the act of September 13, 1888, 25 Stat. 476, c. 1015, nor in that of October 1, 1888, 25 Stat. 504, c. 1064, when the absolute exclusion of Chinese laborers was prescribed. *Chinese Exclusion Case*, 130 U. S. 581.

We are of opinion that it was not intended that commercial domicil should be forfeited by temporary absence at the domicil of origin, nor that resident merchants should be subjected to loss of rights guaranteed by treaty, if they failed to produce from the domicil of origin that evidence which residence in the domicil of choice may have rendered it difficult if not impossible to obtain; and as we said in considering the application of this petitioner for the writ of certiorari, 141 U. S. 583, 588, we do not think that the decision of this court in *Wan Shing* v. *United States*, 140 U. S. 424, ruled anything to the contrary of the conclusions herein expressed. As there pointed out, *Wan Shing* was not a merchant, but a laborer; he had

acquired no commercial domicil in this country : and whatever domicil he had acquired, if any, he had forfeited by departure and absence for seven years with no apparent intention of returning. All the circumstances rendered it possible for him to procure and produce the specified certificate and required him to do so. We have no doubt of the correctness of the judgment then rendered and the reasons given in its support.

*As Lau Ow Bew is, in our opinion, unlawfully restrained of his liberty, we reverse the judgment of the Circuit Court of Appeals for the Ninth Circuit, and, as required by § 10 of the act of March 3, 1891, remand the cause to the Circuit Court of the United States for the Northern District of California, with directions to reverse its judgment and discharge the petitioner.*