**UNITED STATES ex rel. VOLPE v. SMITH, District Director of Immigration.**

No. 4607.

Circuit Court of Appeals, Seventh Circuit.

Jan. 11, 1933.

Rehearing Denied Feb. 1, 1933.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

EVANS, Circuit Judge (after stating the facts as above).

The legal questions involved may be stated in the form of two queries:

First. Is an alien deportable under Section 155, Title 8, U. S. C. (8 USCA § 155), which provides for the deportation of "any alien who was convicted, or who admits the commission, prior to entry, of a felony or other crime or misdemeanor involving moral turpitude," because of a conviction in the United States for counterfeiting, which conviction occurred nineteen years after his first entry and three years prior to his reentry?

Second. Does an alien enter the United States without inspection within the meaning of the statute (8 U. S. C. § 155 [8 USCA § 155]) subjecting him to deportation therefor, when he falsely states to the immigration inspector upon reentry that he is a naturalized citizen of the United States and thereby avoids further interrogation by the inspector?

The district court answered the second question in the affirmative and dismissed the petition for habeas corpus. Judge Wilkerson answered the first question in the negative, basing his decision on what he believed to be the weight of divided judicial opinions. He did not express his personal opinion on this question, but said:[1]

"The question is one which has not been decided by either the Supreme Court of the United States or the Circuit Court of Appeals for the Seventh Circuit. * * *

"It appears that this question has been decided against the United States by the Circuit Court of Appeals of two circuits. A District Court, in my opinion, should accept that as the weight of authority and should follow it, unless and until a different rule is laid down by the Supreme Court or by the Court of Appeals of this Circuit."

Courts which have passed on both questions have differed in their conclusions. This court has been unable to agree upon the correct answer to either question.

The part of the statute applicable to the facts set forth in the first query reads: "any alien who was convicted, or who admits the commission, prior to entry, of a felony or other crime or misdemeanor involving moral turpitude * * * shall, upon the warrant

John Elliott Byrne, of Chicago, Ill., for appellant.

Thomas Dodd Healy, of Chicago, Ill., for appellee.

[1] Orally.

of the Secretary of Labor, be taken into custody and deported."

Cases which hold that the deportable offense involving moral turpitude may have been committed in the United States or abroad are here collected.[2] Cases which limit the commission of the offense referred to by the statute to those committed abroad are also here collected.[3]

In reaching our conclusion on this question, the majority of this court have done so on the following assumptions and reasoning.

Entry into the United States and continuous residence herein afterwards are not natural nor inalienable rights which an alien possesses, but are privileges enjoyed by sufferance of the United States. Johannessen v. U. S., 225 U. S. 227, 240, 32 S. Ct. 613, 56 L. Ed. 1066. In other words, the United States may deny an alien permission to enter the United States altogether, and likewise the United States may remove the alien from its borders as it sees fit. This absolute right to deny entry to the alien, as well as the right to remove him from its boundaries, carries with it the lesser authority to impose conditions upon the alien's right to enter or to make his stay here conditional upon his good behavior, and his respect for law, and his non-violation of the criminal laws of the land. Congress has exercised its power to deal with the subject and has limited and restricted both the alien's right to enter and his right to remain after he has entered. Responding to a rising tide of public sentiment, Congress has, during the past fifteen years, made these limitations and restrictions more specific and drastic. The same authoritative voice of the United States has, with what seems to be a reasonable regard for the welfare of both the alien and the people of the United States, declared that an alien who has committed one of several designated crimes, all of which are offensive and reprehensible and involve moral turpitude, shall be excluded from the United States. In other words, it has provided that the alien who is here by sufferance, and who is, so to speak, a guest, betrays the confidence which was evidenced by his permission to enter, when he commits an offensive crime. This betrayal of confidence terminates his right to remain here. His privilege of staying may thereafter be revoked. Protection against removal of the alien by the United States, however, has been provided by extending to him the privilege of citizenship which is open to all who have lawfully entered the United States for the purpose of residing here permanently. Once a citizen, the alien-born is not subject to deportation.

The entire matter being one for determination by the United States Government, and Congress having spoken on the matter, courts may not legislate on the subject or attempt to substitute their judgments for that of Congress.

In studying the language of this statute, it is significant to note that the crimes specified are those familiar to the people of the United States—"felony," "misdemeanor." The phrase "involving moral turpitude" is a familiar term in the courts of the United States. The language thus adopted is rather persuasive. For it would indeed be strange that Congress in phrasing the statute should define the offenses for which the alien might be removed, in the language of the American lawyer and the American court, if only offenses committed by the alien in a foreign country were to be included.

In Lewis v. Frick, 233 U. S. 291, 34 S. Ct. 488, 58 L. Ed. 967, and Claussen v. Day, 279 U. S. 398, 49 S. Ct. 354, 73 L. Ed. 758, the word "entry" as used in the above-quoted section was held to include a subsequent entry as well as the original entry. Why then should courts restrict its meaning by holding that the offense must be committed before the original entry? Finally, there is no reason—no basis for the distinction between like offenses committed abroad and those committed in the United States. When we make this statement we assume, of course, that appellant would be excludable had he practiced counterfeiting in Cuba. Are not the same reasons justifying his exclusion present if he counterfeited in the United States? The time limitations in the statute no doubt are in the nature of a Statute of Limitations, which has sound reason to support it. But a distinction based upon the place where the crime is committed is one which offers no rational explanation for the distinction which appellant has attempted to make.

It is not the length of the alien's residence in the United States that is significant. What controls is the fact that alien status has continued during all the years he resided in the United States. As an alien, he enjoyed certain privileges and immunities which would not have been his had he been a citizen. On the other hand, as such alien he was

[2] U. S. ex. rel. Medich v. Burmaster (C. C. A.) 24 F.(2d) 57; Bendel v. Nagle (C. C. A.) 17 F.(2d) 719, 57 A. L. R. 1129; Weedin v. Tayokichi Yamada (C. C. A.) 4 F.(2d) 455; Gomes v. Tillinghast (D. C.) 37 F.(2d) 935.

[3] Wilson v. Carr (C. C. A.) 41 F.(2d) 704; Wong Yow v. Weedin (C. C. A.) 33 F.(2d) 377; Browne v. Zurbrick (C. C. A.) 45 F.(2d) 931.

subject to deportation if and when Congress saw fit to provide for his removal. Under the legislation which Congress enacted on the subject, his stay was made to depend upon his own good behavior. If he saw fit to flout the laws of the country which gave him shelter, to engage in counterfeiting its money or its war savings stamps, then his exclusion was the result of his own improper conduct. If there be any basis for distinguishing between offenses committed abroad and those committed in the United States, it would seem that Congress might well have viewed the latter as the more reprehensible. For naturally, counterfeiting by the alien abroad, while conduct over which Congress would hardly be enthusiastic, would be less irksome, less provocative of action by Congress than indulging in a similar pastime in the United States.

It is, however, idle to further pursue the possible or probable reasons that motivated the various Congresses in passing the legislation enacted on the subject of immigration. But surely, in passing, it may be fairly and persuasively said that there are better reasons for closing the door to the immigrant who has a criminal record than for excluding one because he is illiterate, a pauper, or because of the color of his skin.

The question in the last analysis is a very narrow one. It is: What is the meaning of the word "entry"? Does it mean *original* entry? Or do the courts give to the word a meaning unrestricted by a limiting adjective? Fortunately, the Supreme Court, in Claussen v. Day and Lewis v. Frick, supra, defined it as meaning what it says—not only the original, the second or the last entry, but *any* entry.

Question number one should be answered in the affirmative.

█ As to the second question, the courts are likewise in disagreement as to the effect of an alien's falsely stating to the immigration inspector that he is a citizen of the United States. Herewith are collected cases which uphold an affirmative answer [4] and also those which hold to the contrary.[5]

The section of the statute applicable to this question reads as follows: " * * * at any time within three years after entry, any alien * * * who enters without inspec-

tion, shall, upon the warrant of the Secretary of Labor, be taken into custody and deported. * * * " (8 USCA § 155.)

The character of the deception which is here under consideration is significant. It was not one that went to a matter of detail—an incident in the officer's examination of the applicant. It was not merely a case of the applicant's falsifying. The falsification went to the vitals of any inspection. If appellant were a citizen of the United States, there was no inspection required. In fact, the inspector would have offensively exceeded his authority had he inspected a citizen after satisfying himself that the entrant was a citizen. Only inspection of aliens was necessary. The preliminary inquiry into appellant's citizen status was a requisite to determine whether any inspection was needed. Appellant's deception, therefore, was of a nature which resulted in the avoidance of an inspection.

The wisdom, as well as the necessity, of requiring an alien entering the United States to undergo an inspection is apparent. Regulation and control of immigration would be impossible without examination and inspection of the incoming aliens. If the sections of the statute which exclude aliens who are diseased, criminal or insane persons, are to be effectively carried out, examinations are necessary. If the quota law is to be complied with, all aliens must report for registration and inspection. It is to secure the enforcement of the other sections of the immigration act, which are enacted for the benefit of the public generally, that registration and inspection of aliens are so essential.

In disposing of this second question, therefore, it might be, and is, without further argument or the citation of authorities, assumed that no alien may lawfully enter the United States except as he submits to inspection and meets the physical, educational, and moral requirements which Congress has seen fit to prescribe. Equally clear and unequivocal is the statute which provides that aliens who do not enter the United States lawfully may be deported.

Had the entering alien failed to report to the inspector at all, he would not have complied with the statute which required an inspection. Had he reported to the inspector and at the point of a revolver secured a record which showed an affirmative right to enter the United States, he would hardly contend that he submitted to inspection. May an alien through the more subtle, but none the less effective, method of deception accom-

[1] U. S. ex rel. Natali v. Day (C. C. A.) 45 F.(2d) 112; Ex parte Saadi (C. C. A.) 26 F.(2d) 458; Williams v. U. S. (C. C. A.) 186 F. 479; Ex parte Greaves (D. C.) 222 F. 157.

[5] U. S. ex rel. Iorio v. Day (C. C. A.) 34 F.(2d) 920; U. S. v. Southro (C. C. A.) 8 F.(2d) 1023; Ex parte Guest (D. C.) 287 F. 884; Ex parte Lalime (D. C.) 244 F. 279.

plish what he could not have done by duress? Is fraud less destructive than duress or entire avoidance, if official action (here an inspection) be thereby avoided? Considering the purposes of an inspection, we conclude that anything which defeats it—fraud, deceit or duress—negatives it, avoids it.

No other false or fraudulent representation could have accomplished its unlawful purpose so effectively as the one appellant adopted. To assert that he was a citizen of the United States and that his naturalization papers were in Chicago wholly disarmed the inspector and terminated the inspection. What the officer would have discovered, or might have discovered, had the inspection not been thwarted is beside the question. The inspection contemplated was defeated. In legal effect, there was no inspection.

■ This appeal, being from a decree dismissing an application for a writ of habeas corpus, in which proceeding the reviewing court is not at liberty to weigh the evidence, but merely to ascertain whether there is any evidence upon which the order of deportation may lawfully rest, I have not discussed any of the conflicts in the evidence nor attempted to weigh such conflicting statements.

The judgment is affirmed.

ALSCHULER, Circuit Judge (dissenting).

Of the two legal propositions discussed in the opinion, the first was decided by Judge Wilkerson in appellant's favor, and the second against him. This court now decides both against him. I am convinced that Judge Wilkerson was right on the first and wrong on the second, and that this court is wrong on both.

While the record discloses matters well calculated to make one "see red," to my mind these things have no bearing on the right to re-entry of this domiciled alien who had first entered at sixteen, and in 1928, twenty-two years after this entry, was returning from Cuba from a few days' visit there—his first absence since he first entered the country. The opinion states that, "At this [deportation] hearing appellant admitted he had been arrested many times." He did admit frequent arrests in this country, and undertook explanation of them. But there is nothing in the record to show that they had the remotest bearing on his right to re-enter or to remain here—unless indeed it be the arrest on the counterfeiting charge, if the conviction thereon may afford ground for the deportation.

It further appears that early in the deportation hearing Volpe was asked: "Do you know Al Capone, the so-called gang leader in this city?" "Have you ever had business dealings with him?" He refused to answer the questions, though later in the examination he did answer them, admitting the acquaintance but denying material dealings. But what had these matters to do with his right to re-enter or to remain here? Assuming that he was Capone's closest friend and sympathizer, how could that affect any question here in issue beyond making "background"? His right to re-enter depended to no degree upon the quality of his friends and associates, or on his own character or reputation or his moral standards.

Such irrelevant reference to Capone suggests to me that back of this deportation is Volpe's supposed participation in Capone's supposed high crimes and misdemeanors, as well as his supposed complicity in other criminalities. This inference is emphasized by the record disclosure that at the inception of the deportation proceedings, and for evident lack of evidence of a more tangible crime on which to charge and hold Volpe pending his preliminary questioning by the immigrant inspector at Chicago, he was brought before State Municipal Judge Lyle on a charge of *vagrancy* and his bond fixed at *$10,000* (which was given), and the federal immigration inspector then proceeded, *in Judge Lyle's chambers,* to question him respecting the re-entry.

While the motives actuating such prosecution must not control the conclusions of the court, they should suggest caution in accepting the fact recommendation of this only trier of the facts, and in determining whether, notwithstanding his recommendation, the great weight of the evidence was not on the side of the alien.

In this connection I here refer to the evidence bearing on the later added charge of entering without inspection. The inspector first made his recommendation for deportation to the department, and the first deportation warrant was issued upon both of the alleged grounds. At that stage there was practically no evidence of Volpe's assertion of citizenship to the inspector, except that an unsigned form, uncertified until just before the hearing, had been filled out by some one, presumably at the time of the re-entry, listing Volpe as a citizen. At that stage of the case there was no testimony that Volpe stated he was a citizen. Three of the six others who then entered with him were witnesses at the hearing and testified that Volpe did not then say to the inspector he was a citi-

zen, but that he said he had first papers. Volpe himself testified he told the inspector he had had citizen papers which he had given up. It was in this state of the evidence, with practically nothing to indicate a representation of citizenship, and the testimony of four denying that such representation was made, that the inspector recommended deportation on the ground of Volpe's statement of citizenship to the inspector, which it is contended amounted to a lack of inspection.

But, notwithstanding the deportation warrant had already issued, it appears that after the writ of habeas corpus had been granted the immigrant inspector took a new hold, and had the case reopened, and for the first time there was introduced as a witness Inspector Phillips from Florida, who said he was the inspector who admitted Volpe and his associates at Key West on their return by airplane. Although the hearing was nearly three years after the time of the re-entry—and the entries at that port were from 30,000 to 50,000 annually, of which Phillips said he had his full share—and although during all this time his attention had never been called to this matter, he assumed to give the very words of the conversation between Volpe and himself, and even to identify him as he saw him at the hearing for the first time since the re-entry. He could not describe any of the others who entered with Volpe or even state any of his conversations with them, although there appears no reason why he would recall such details as to Volpe and not as to any of his associates.

Notwithstanding that the deportation warrant had been issued long before Phillips testified, evidently the representatives of the government deemed it so necessary to bolster up the case on the proposition of false representation of citizenship as to require reopening at that advanced stage of the proceedings to let in Phillips' testimony. But to my mind his incredible feat of memory did not give substantial evidentiary support to this proposition, whereon in my judgment the great weight of the evidence was with appellant, after as well as before Phillips testified.

It is apparent that claim of citizenship, even if made, was not "out of whole cloth." The evidence showed that he had been granted citizenship, and that citizenship papers had been issued and delivered to him; but that afterwards the naturalization officer at Chicago told him that if he did not give back the papers he would be prosecuted for perjury, and that thereupon he handed the papers to that officer, and there was a notation in the inspector's office at Chicago that the petition for final papers had been dismissed. This is all the record shows on the subject of perjury. It does not disclose the actual ground for taking back the papers, or vacating the State court judgment granting him citizenship, if in fact it ever was vacated.

The first legal proposition rests on alien's conviction, after his nineteen years' domicile, for counterfeiting stamps and for conspiracy to do so. There was a trial and disagreement of the jury, and thereafter Volpe and several co-defendants pleaded guilty and were given sentences, some to the penitentiary, and Volpe to *thirty days in jail*.

Assuming that his explanation of his plea of guilty—the expense which the trial had occasioned him, and his inability to undergo the cost of another—has no bearing, and that the term of his sentence, whether for five minutes or five years, will not avert the conclusion that he was convicted of an offense involving moral turpitude, will this, or any conviction not occurring outside the United States, consign him to a statutory excluded class and so bar him ever after from re-entry, if perchance he thereafter momentarily steps beyond our boundaries?

Manifestly the conviction would not have served as a basis for his deportation had he not gone out of the country, because (a) the penalty imposed was less than one year of imprisonment, and (b) conviction was more than five years after his original entry. Section 19, Immigration Act of 1917, 8 U. S. C. § 155 (8 USCA § 155).

I cannot see how this act, which could not place him in one of the excluded classes while he continued to remain, will nevertheless take on a retroactive effect, and in case of re-entry consign him nunc pro tunc to an excluded class. I believe if the conviction cannot serve directly to deport the lawfully domiciled alien, it should not thus indirectly be made to effect the same end. Such considerations, coupled with the atrocious possibilities of the contrary holding, convince me that the statute barring entry for conviction of crimes involving moral turpitude committed before entry, was intended to apply only to crimes committed outside the United States, but in no event to crimes which, if here committed, would not have afforded ground for deportation.

This proposition does not appear to have been decided by the Supreme Court, but a number of times has been before the Courts of Appeals and the District Courts, and the great weight of authority is in favor of such

limitation of the statute's application. The precise question was before the Sixth Circuit Court of Appeals in Browne v. Zurbrick, 45 F.(2d) 931, pages 933, 934, where the conclusion was reached that the statute refers only to crimes committed outside the United States. In the opinion, by Judge Denison, the prior decisions on the subject were so fully reviewed, and the questions so thoroughly discussed, that, in the interest of brevity, I refer to it as if here set out. In Wong Yow v. Weedin, 33 F.(2d) 377, and Wilson v. Carr, 41 F.(2d) 704, 706, the Ninth C. C. A. reached a like conclusion and for the very excellent reasons there stated.

The government relies on previous cases in the Ninth C. C. A. where that court held differently. Weedin v. Tayokichi Yamada, 4 F.(2d) 455, followed, by the same court, in Bendel v. Nagle, 17 F.(2d) 719, 57 A. L. R. 1129. But I believe these are clearly superseded by Wong Yow v. Weedin and Wilson v. Carr.

The opinion cites the cases of Lewis v. Frick, 233 U. S. 291, 34 S. Ct. 488, 58 L. Ed. 967, and Claussen v. Day, 279 U. S. 398, 49 S. Ct. 354, 73 L. Ed. 758, as indicating that the re-entry is to be regarded in the same light as if there had been no previous domicile here. These cases have to do only with the influence of the statute of limitations upon deportation. In each the ground whereon deportation was sought was sufficient therefor—the first, the bringing in a woman for purposes of prostitution, and the other, conviction and sentence for more than a year for murder committed after the re-entry. For each alien it was contended that, counting the time the alien was domiciled here prior to his last entry, his deportation was barred by the statute. The Supreme Court held that the aliens having within the statutory period following their last entry committed acts which were sufficient to warrant deportation, the prior domicile afforded no ground for invoking the bar of the limitation.

If here it had appeared that Volpe, within the statutory period *after* his re-entry, had committed an act which would have warranted his deportation, he could not under these cases be heard to say that his long period of prior domicile here barred his deportation.

To my mind there is not, upon the facts or in principle, the remotest relation between those cases and that at bar, where not only was the conviction long after the original entry, but was not such in respect to its penalty as would in any event have been sufficient ground for deportation.

I am in accord with Judge Wilkerson's conclusion that the manifest weight of authority on this proposition is with appellant, and believe that on principle as well as on authority this court should so hold.

Judge Wilkerson's discussion of the second proposition proceeds upon the assumption that on re-entry from Cuba Volpe falsely stated to the immigration inspector at Key West that he was a citizen of the United States, and the judge concluded and stated that under the weight of authority this constituted entry without inspection, wherefore Volpe became deportable under the applicable statute for deportation at any time after entry without inspection. Section 19, supra.

The reliance there, as well as in this court, is upon Ex parte Saadi, 26 F.(2d) 458 (C. C. A. 9), and United States ex rel. Natali v. Day, 45 F.(2d) 112 (C. C. A. 2). In the former the court did hold that the alien's re-entry from temporary absence on representation of his citizenship constituted entry without inspection, and he was subject to deportation.

But the Natali Case involved no question of re-entry through materially false and misleading statements to an immigration inspector. There the domiciled alien went to Canada to assist another alien to enter the United States without inspection. At night an Indian rowed them across the St. Lawrence river to New York, landing them at an evidently unauthorized place, and without any inspection whatever or opportunity for it. All that the court there held was that on re-entry there must be inspection, a proposition which is not controverted. Surely that case is not helpful on the question here involved.

Evidently the attention of the district judge had not been called to the case of Ex parte Gouthro, 296 F. 506, 510 (D. C.), the opinion in which was, on appeal, approved and adopted by the Court of Appeals of the Sixth Circuit, U. S. v. Southro, 8 F.(2d) 1023. That opinion presents cogent discussion of what constitutes inspection under the statutes, and points out that any examination by the inspector supplied the requirement of inspection, regardless of the extent of the inspection or whether or not false and misleading answers of the alien averted other inquiries which the inspector in his discretion might have made; and it concludes that, since the statute makes no provision for

deportation because of false and misleading answers of the alien, the making of such false and misleading answers in no event affords any legal basis for the contention that the alien entered without inspection. The opinion so fully answers the government's contention here upon that proposition that for convenience a marginal quotation therefrom is included.[6]

In Ex parte Guest, 287 F. 884, 890 (D. C.), to which the opinion refers, it is stated: "That persons who have not made a false oath, but who have given misinformation upon inspection, are to be classified as persons who entered without inspection, is

[6] "It is the contention of the government that the statements thus made by petitioner to the immigration inspector were false and misleading, and induced said inspector to omit further investigation into her right to enter the country, and that therefore she entered 'without inspection,' within the meaning of the Immigration Act. There is no evidence whatever to the effect that petitioner avoided further questions by her answers to the questions which were asked of her. Nor does it appear that any further questions would have elicited facts showing any ground for her exclusion. No such facts were developed by the searching cross-examination to which she was subjected at the hearing before the immigration officials in the deportation proceedings already mentioned and there seem to have been no grounds for the exclusion of petitioner. * * *

"No legal definition nor explanation of the meaning of the word 'inspection,' as used in this statute, has been brought to the attention of this court, and I have been unable to find any. The Immigration Act provides in general terms that 'the inspection' of aliens seeking admission shall be 'conducted by immigrant inspectors,' and such inspectors are authorized to 'board and search for aliens any vessel, railway car, or any other conveyance, or vehicle in which they believe aliens are being brought into the United States.' * * * If such an inspector is afforded a full and fair opportunity to make such an inspection of arriving aliens as he may deem sufficient, it cannot, in my opinion, be properly said that any such alien has entered 'without inspection,' even though it later develops that said inspector has not made as complete or successful an inspection as he could or should have made, especially in view of the discretion vested in immigration inspectors as to the nature and extent of the inspection required. * * * Even if the petitioner made false and misleading statements to him, he was not obliged to accept them as true, or to refrain from such further questions and investigation as would enable him to reach a proper conclusion as to the right of petitioner to enter the country. If a witness in court makes false statements on cross-examination, and thereby induces cross-examining counsel to forego further questioning, such a witness cannot be said to have testified 'without cross-examination.' The real complaint of the government in this connection is that petitioner made false and misleading statements to the inspector. While, however, that might have been, and perhaps should be, made a ground for the exclusion of aliens, Congress has not yet seen fit to so enact. I reach the conclusion that, whether or not petitioner made false and misleading statements to the inspector, as alleged, the contention of the government that petitioner entered without inspection is without legal basis and cannot be sustained. Ex parte Lalime (D. C.) 244 F. 279; Ex parte Guest (D. C.) 287 F. 884."

hardly a satisfactory interpretation of the law as a whole."

In passing, it may be said that there is here no claim or proof that Volpe made or was asked to make oath to any statement to the inspector on his re-entry.

In Ex parte Lalime et al., 244 F. 279, 282 (D. C.), also there cited, the court said: "No decision has been called to my attention holding that a misstatement to an immigration inspector, made by a person not within the excluded classes, is ground for deportation after the alien has been admitted into this country. There is no express provision to that effect in the statute, and I do not think the statute can properly be extended by implication to confer such extremely wide powers."

It thus seems apparent to me that the great weight of the authorities, far from sustaining the conclusion reached by the District Court upon the second proposition, is most decidedly to the contrary.

The attitude of Congress with respect to this proposition is quite significant. The Gouthro, Guest, and Lalime Cases were decided before 1929. In 1929 there was pending in Congress a bill to amend the immigration laws, in which there was a section defining deportable aliens to be, inter alia: "(5) An alien who hereafter enters the United States at any time or place other than as designated by immigration officials, or eludes examination or inspection by immigration officials, *or obtains entry into the United States by a wilfully false or misleading representation or the wilful concealment of a material fact.*" This would for the first time have introduced into the immigration statutes provision for deportation for a willfully false or misleading representation or the willful concealment of a material fact. Upon conference of the committees of the Senate and House this classification (above italicized) was stricken from the proposed bill, and has never thereafter been included in the law, notwithstanding subsequent frequent amendment of the immigration laws. Congress could not have been unmindful of the holdings of the majority of the federal courts which had expressed themselves to the effect that such false or misleading statements did not constitute entry "without inspection," and must have been aware that the very decided weight of authority was then against deportability for any such cause. This action would persuasively indicate that Congress was willing to leave the statute thereon as most of the federal courts had interpreted it.

It is noteworthy that, unless it be con-

cluded that the conviction on the counterfeit charge constituted a bar to his re-entry, the alleged false statement of citizenship to the inspector concealed nothing which would have barred Volpe's right to re-entry. This right to no extent depended upon his acts, his reputation, his character, or anything else which by the statute is not made ground for his exclusion or his right to re-enter. He may have been arrested a hundred times in the United States, and his associations may have been of the most disreputable, yet all of this could not have barred his re-entry, nor be any basis for his deportation. He might thereby have been barred from citizenship; but unfitness for citizenship would not be lawful ground either for deportation or denial of re-entry to a domiciled alien who had temporarily departed. His right to re-enter did not directly or indirectly depend upon whether he was or might become a citizen of the United States; and, so far as this record shows, protracted, repeated, and microscopic investigation into his life, for the purpose, evident to me, of deporting him at all hazard, has wholly failed to bring to light any legal ground for his deportation, if not found in the above stated conviction.

In Ex parte Guest, supra, it was said: "It does not appear that anything was concealed which, if known to the immigration inspectors, would have been a cause of exclusion."

In Lewis v. Frick (C. C.) 189 F. 146, 150, in discussing the effect of false statements to the inspector of immigration, it was said: " * * * if their falsity had been discovered when made, he would, nevertheless, have had a perfect right to return to his domicile in Detroit."

And in Gegiow v. Uhl, 239 U. S. 3, 36 S. Ct. 2, 3, 60 L. Ed. 114, it was said: "The statute by enumerating the conditions upon which the allowance to land may be denied, prohibits the denial in other cases."

It logically follows that, be he saint or devil, Volpe's statement of citizenship, if made to the inspector as claimed, did not mislead the inspector to his detriment, and covered up nothing (unless the above conviction) which if fully revealed would to any degree have barred his re-entry. To say that the statement of his citizenship amounted to entry without inspection is, to my mind, a mere figure of speech whereby fancy is made to displace fact.

The statute does not specify what constitutes an inspection. Phillips' evidence is that the scope of the examination is largely within the inspector's discretion and judgment. If the alien physically submits himself for inspection at a proper port of entry, and the inspector admits him even without a word being uttered, I am of the belief that the inspection was sufficient, and he could not thereafter be deported merely for the want of it. Of course, if the alien "guns" himself in, as supposititiously stated in the opinion, a situation would be presented so very different from that here as to require no consideration. If under certain circumstances the inspector might have pursued the inquiry further, this does not militate against the conclusion that Volpe was in fact inspected. Indeed, Inspector Phillips testified that at that time there were no papers required for re-entry of a domiciled alien after his temporary absence in Cuba of less than six months, and that if he (Phillips) were satisfied that such an alien seeking re-entry was the person he claimed to be, he would ordinarily be admitted. (See marginal note 6 above.)

Upon this proposition, not less than the other, grievous injustice and extremes of harshness and inhumanity could easily follow in the wake of such construction as that for which the government contends—not the least of which might be the alien's liability to deportation upon the fallible recollection of an immigration inspector as to conversations occurring perhaps decades before the deportation proceedings were begun.

I well realize that in the admission or deportation of aliens Congress may in its discretion impose on aliens discriminations without reason, and hardships and inhumanities without limit; and if it has clearly so prescribed, this is the last word. But as was said in Lau Ow Bew v. United States, 144 U. S. 47, 59, 12 S. Ct. 517, 520, 36 L. Ed. 340: "Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion. Church of the Holy Trinity v. United States [143 U. S. 457], 12 S. Ct. 511 [36 L. Ed. 226]; Henderson v. Mayor of New York, 92 U. S. 259 [23 L. Ed. 543]; United States v. Kirby, 7 Wall. 482 [19 L. Ed. 278]; Oates v. National Bank, 100 U. S. 239 [25 L. Ed. 580]."

In my judgment the statutes do not require and should not receive the construction for which appellee contends and which this court adopts. I believe the judgment of the District Court should be reversed, with direction to discharge appellant on the habeas corpus.