## UNITED STATES ex rel. PINCUS v. SAVORETTI.

Civ. A. No. 5064–M.

United States District Court
S. D. Florida, Miami Division.

Sept. 16, 1953.

David W. Walters, Miami, Fla., for petitioner.

James L. Guilmartin, U. S. Atty., Douglas P. Lillis, Acting Dist. Counsel, Immigration and Naturalization Service, Miami, Fla., for respondent.

WHITEHURST, District Judge.

Petitioner, Pincus, sought and obtained habeas corpus writ to test and review an order of deportation by which he was held in custody by respondent.

Respondent's return admits the detention of petitioner pursuant to an order of deportation entered under authority of Section 19 of the Immigration Act of February 5, 1917, as amended, 39 Stat. 889–890, 54 Stat. 671–673, 56 Stat. 1044, 8 U.S.C.A. § 155, and submits, as part of the return, the record of the deportation proceedings conducted by the Examiner, as well as the affirming opinion of the Board of Immigration Appeals.

The record of testimony taken by the Examiner discloses that petitioner was invited to join a fishing party on the boat Verjo III by one Massey, its reputed owner, in October, 1950. According to his testimony, Pincus was an ardent fisherman and availed himself of every opportunity to follow his favorite pastime. He denies that he had any knowledge of the location of the projected fishing operation. The names of the persons making up the fishing party were telephoned to the captain, but by whom he did not know. The captain says there was some discussion among the passengers after the boat left Miami about going to Bimini to fish. The fishing trip was frustrated on account of bad weather and two of the party returned to Miami by airplane. Pincus remained aboard the boat with the crew and returned to Miami. Pincus never left the boat from the time of embarkation at Miami until his return to Miami.

The mate was asked, "Was there any general conversation among the passengers or crew as to the fact that they were going to Bimini to fish, or anything out of the ordinary?" His answer: "No, I don't think so." He also testified that the trip was originally planned for fishing in the Keys but was cancelled out because of weather, and the trip to Bimini was a last-minute decision made by one of the bosses. The mate further testified that all passengers were asleep upon arrival at Bimini and remained asleep. There had been some heavy drinking. They remained overnight, two of them returning by plane and the captain and the mate and Pincus returned by boat. The mate was asked whether on the trip back Pincus knew he had been to and in Bimini. He replied that he couldn't say that Pincus knew much about anything, that "he was pretty well under the influence".

Some of the testimony in the record intended to contradict inferentially the claim of Pincus that he was ignorant of the destination of the boat should not be considered because of its inadmissibility under the rules of evidence. There was no direct testimony coming from any quarter to the effect that Pincus knew of the destination of the party at the time he went aboard the boat. And while Pincus' testimony must be weighed in the light of self-interest, the record does not contain that character of proof necessary to establish the very essential gravamen of the case here, i. e., that Pincus knowingly and, therefore, voluntarily visited a foreign port so as to make his reentry subject to inspection.

The Board of Immigration Appeals must have had some doubt on that point, as indicated by the following language:

"We do not, however, base our decision on whether Pincus had actual knowledge of the boat's destination."

but, rather, based its determination upon the following question and answer in the examination of Pincus, appearing on Page 67 of the record:

"Q. If he (referring to Massey) had had half a case of bourbon to put on the boat and said, 'We are going to Bimini', would it have made any difference? A. No. If they were going to Europe I would have gone just to fish and pleasure. I love it and I do it even now every week."

Can this hypothetical inquiry by the Examiner and the gratuitous answer by the petitioner supplement the dearth of proof that Pincus voluntarily visited a foreign port on the occasion in question so as to make his return a reentry? I think not. Should his candid answer to this question be accorded greater verity than his repeated testimony that he had no knowledge of the destination of the fishing party at the time he went on the boat? Quoting from his testimony before the Examiner, on page 39:

"Q. Is there any evidence you wish to present at this time, or anything you wish to say in connection with this hearing? A. I have a lot I want to say. I haven't done anything that I thought was committing a crime * * * that I left the country? I didn't even know where I was going when I went on that boat; they never told me where they were going. I went on a fishing trip and helped on the boat.

"Q. You mean you didn't know where they were going? A. No sir.

"Q. When did you find out? A. When we got in Bimini. I never heard of the place in my life!

"Q. And that was when they told you? A. I would have never went because I only went on fishing trips for $3.00 or $4.00 * * * we pulled near islands * * * I'm a good seaman * * * I always take my children * * * I always go on the bridge to fish."

and on page 43:

"Q. When you made the trip on the boat Verjo III to Bimini in October 1950, who invited you to go on that trip? A. Mr. Massey, and the Mate, Curley.

"Q. Did they state to you where they intended to go at that time? A. They said something about fishing. We were drinking at the Tahati Bar, and there was some Scotch put on the boat, and when they asked me to go fishing I said, 'I don't drink Scotch', so Joe said, 'Put some Bourbon on', and they put a half a case of Bourbon on the boat, and we went out to fish, and I never heard anything about the place where we were going.

"Q. The question was asked you whether they told you where they were going; did they tell you that? A. No.

"Q. Did you know where they were going? A. I did not."

The captain of the boat, Mr. Engel, when asked whether Mr. Pincus knew that the boat was going to Bimini at the time that he, Pincus, went on board, answered, "All I can say is I imagine he did; his name was on the papers".

Since the rule announced in Delgadillo v. Carmichael, District Director, Immigration and Naturalization Service, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17, and Di Pasquale v. Karnuth, 2 Cir., 158 F.2d 878, and Yukio Chai v. Bonham, 9 Cir., 165 F.2d 207, an alien in lawful residence in the United States does not go foreign by going into a foreign country unless his visit thereto is knowingly and intentionally made and, therefore, voluntary. If his visit to a foreign port or country is brought about by circumstances beyond his control, or for which he is not responsible, so that it can be said that his visit foreign was not of his own volition, then his return to the United States is not a reentry which requires inspection by Immigration authorities.

In Yukio Chai v. Bonham, supra, the petitioner, a Japanese national, was returning to Seattle from Alaska on a boat which made an unscheduled stop for a few hours at Victoria, British Columbia. Petitioner knew nothing of the intention of the ship

to enter the foreign port, nor that it had done so. It was held that petitioner's return to Seattle was not an entry.

The theory of the Government's case here is that when petitioner returned to Miami he reentered the United States and when petitioner falsely stated that he was a citizen of the United States he avoided inspection and thereby subjected himself to deportation. Petitioner admitted making the false statement alleged but offered as excuse that he was ashamed to say he was an alien. At the hearing on return of the writ Government counsel stated that except for the false statement of petitioner on his return from Bimini that he was a citizen of the United States, thereby avoiding inspection, there was no lawful ground under the statute for his deportation. Petitioner's counsel at the hearing and by brief countered that conceding the falsity of petitioner's statement it related to an immaterial matter, since if petitioner had truthfully admitted that he was not a citizen of the United States there was no existing ground under the statute for his deportation. In other words, even if petitioner's return to Miami on the occasion in question was a reentry under the law, there was no existing ground under the law that would authorize his deportation, and therefore his false representation as to citizenship was immaterial and would not sustain a deportation warrant.

Having reached the conclusion that petitioner's return to Miami has not been shown to be a reentry, the second question posed, i. e., whether his false representation was of such nature as would constitute avoidance of inspection, becomes moot so far as this case is concerned. It is interesting to note, however, the diversity of opinion on this question as reflected by the majority and minority opinions and cases there cited in United States ex rel. Volpe v. Smith, District Director of Immigration, 7 Cir., 62 F.2d 808.

Having reached the conclusion that the deportation warrant on authority of which petitioner is held is not sustained by the record, the petitioner should be discharged, and an order will be entered accordingly.